STATE OF CONNECTICUT *v.* COREY TURNER
(SC 15834)

STATE OF CONNECTICUT *v.* CHARLES TURNER
(SC 15837)

McDonald, C. J., and Borden, Palmer, Sullivan and Peters, Js.

Argued November 30, 1999—officially released March 17, 2000*

---

* March 17, 2000, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Suzanne Zitser*, assistant public defender, for the appellants (defendant in each case).

*Rita M. Shair*, assistant state's attorney, with whom were *Joan K. Alexander*, supervisory assistant state's attorney, and, on the brief, *James E. Thomas*, state's attorney, for the appellee (state).

*Opinion*

MCDONALD, C. J. After a joint jury trial, the defendant Corey Turner was convicted of murder in violation of General Statutes § 53a-54a,[1] and first degree assault in violation of General Statutes § 53a-59,[2] and the defen-

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person; or (4) with intent to cause serious physical injury to another person and while aided by two or more other persons actually present, he causes such injury to such person or to a third person; or (5) with intent to cause physical injury to another

dant Charles Turner, Corey Turner's brother, was convicted of being an accessory to those same crimes in violation of General Statutes § 53a-8.[3] The trial court rendered judgment in each case in accordance with the verdict, and each defendant appealed from that judgment to the Appellate Court. We transferred the appeals to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

On appeal, both defendants claim that the trial court improperly precluded them from presenting surrebuttal evidence. In addition, they claim that the prosecutor committed misconduct by vouching for the credibility of certain state's witnesses during closing argument. Corey Turner also claims that the trial court: (1) committed several errors concerning his alibi witness; (2) improperly denied his motion for severance of the trials; and (3) violated his statutory and constitutional rights to a speedy trial. Charles Turner also claims that the many alleged instances of error with respect to Corey Turner's alibi witness harmed his own defense, and that the trial court improperly denied his motion for a judgment of acquittal based on insufficient evidence. We reject all of the defendants' claims and, accordingly, affirm the judgments.

The jury reasonably could have found the following facts. On the evening of August 11, 1995, Corey Turner and Richard Woods, the victim, had an argument in front of Betty Lewis' house at 141 Homestead Avenue in Hartford. At approximately 11 p.m. that night, Darius

person, he causes such injury to such person or to a third person by means of the discharge of a firearm. . . ."

[3] General Statutes § 53a-8 provides in relevant part: "(a) A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender. . . ."

Powell, Kendrick Hampton, Lewis and Woods were together in front of Lewis' house. Blanchard Baisden, also known as "Weedy," Armando Colon, also known as "Mondo," and Lillian Williams also were standing nearby at that time. Corey Turner and Charles Turner drove down the street in a tan Oldsmobile. Shortly thereafter, Charles Turner, now alone in the car, drove back up Homestead Avenue. Charles Turner parked the car at the corner of Homestead Avenue and Edgewood Street, across the street from where Woods and his friends were standing. He then exited the car and began "dancing around." As Powell, Hampton and Woods watched Charles Turner, Corey Turner, wearing a mask and dark clothing, approached the group and shot at Woods with a handgun. The first two shots hit Woods in the leg, and three of the following six shots struck him in the hip. During the attack, Woods shouted "Boku shot me. Boku did it." "Boku" is Corey Turner's street name. Powell and Hampton, who were familiar with Corey Turner from the neighborhood, recognized him as the assailant. After the shooting, Corey Turner escaped through the yards behind the apartment building. Charles Turner, who had jumped back into the tan Oldsmobile when the shooting began, drove down Homestead Avenue and picked up Corey Turner four houses away. Woods later died at the hospital from the gunshot wounds.

I

Both defendants claim that the trial court improperly precluded them from presenting surrebuttal evidence. Each argues that his rights to a fair trial, to present a defense, and to due process of law were violated, under the federal and state constitutions,[4] when the trial court

---

[4] Although the defendants cite both the federal and state constitutional provisions, they do not offer a separate and independent analysis of their right under the state constitution. We, therefore, confine our analysis to the federal constitution. See *State* v. *Pinder*, 250 Conn. 385, 389 n.4, 736 A.2d 857 (1999).

denied each of them the opportunity to present evidence to refute the state's attempt to impeach their credibility. We disagree.

The following additional facts are relevant to these claims. At trial, Corey Turner testified in his own defense, claiming that he was not at the scene of the crime at the time of the murder. Corey Turner stated that he was with Fonda Williams, the mother of his son, at that time.[5] During cross-examination by the state, Corey Turner testified that Williams had visited him in jail prior to her interview with the state's investigator.[6] Corey Turner further testified that, after Williams' interview with the state's investigator, he had telephoned her to find out what the investigator had asked.[7] During

---

[5] All further references to Williams in this opinion are to Fonda Williams.

[6] The following colloquy occurred at trial:

"[Assistant State's Attorney]: Did you talk to [Williams] before?

"[Corey Turner]: Before when?

"Q. Before she came to be interviewed?

"A. Before she came to be interviewed by you?

"Q. Yep.

"A. Yeah, I spoke to her when she came and visited me Saturday.

"Q. Okay. Did you instruct her not to talk to us unless your mother was present?

"A. I had—I told her to make sure somebody was around because she would get on the stand and you would tell her she said something she didn't say. That's what I told her."

[7] The following colloquy occurred at trial:

"[Assistant State's Attorney]: And after she talked to us, did you call her to find out what she said to us?

"[Corey Turner]: I called her and asked her what you asked her. Of course I did.

"Q. Because you wanted to make sure your testimony and her testimony were okay with each other, right?

"A. I just wanted to know what you asked her about me.

"Q. Do you recall asking her about guns?

"A. Yes. My attorney told me that [Williams] said that she told you she seen me with a gun before. And I didn't ask her that. I asked her what you asked her, and she told me that you asked her that.

"Q. And did she tell you that she told us you had guns in the past?

"A. Yes, she did.

"Q. Different kinds of guns?

"A. I don't know exactly what kind of guns or whatever, but she told me

that call, Corey Turner told Williams that it would have been better if Williams had told the investigator for the state that she had no knowledge that he had access to firearms. Corey Turner also testified during cross-examination that, during a telephone conversation with Carlton Smith, also known as "Villian," he had asked Smith to talk to Baisden for him.[8] Throughout this testimony, Corey Turner repeatedly stated that he knew that the telephone conversations he made from jail had been tape-recorded.

After Corey Turner rested, the state offered, as rebuttal evidence, a portion of the tape recording of the telephone conversations between Corey Turner and

she told you I had guns in the past, yes.

"Q. And do you recall your reaction was, 'If you had said not to my knowledge, that would have been sweeter?'

"A. Yes, I did tell her that. I told her, 'Not to my knowledge,' would have been better. You know, I'm being tried for murder. She's trying to score brownie points. Those was my words, yes.

"Q. In fact, that was your next words: 'I'm going to bring it out first now that you've told her so the prosecutor can't score any brownie points.' Is that right?

"A. I just told the jury and you that."

[8] The following colloquy occurred at trial:

"[Assistant State's Attorney]: Sir, did you ever testify—did you ever request anyone other than your attorney or his investigator to go talk to witnesses for you? . . .

"[Corey Turner]: I asked [Smith] to go and speak to [Baisden] because [Baisden] said that he wasn't there, but I guess he—you went and got to him and had him come down here and say he was [t]here.

"Q. Sir, isn't it a fact that you directed [Smith] to go out and find [Baisden] and [Colon]?

"A. [Colon] was incarcerated.

"Q. Find out where [Colon] was incarcerated for you?

"A. I asked him to see which jail he was in. I believe I did.

"Q. Because isn't it your belief that if one or two of these witnesses come in that Kendrick Hampton said was there and they say they're not there, that that would affect Mr. Hampton's credibility to this jury? . . .

"Q. Isn't that what you thought was necessary for creating reasonable doubt in this jury's mind, to attack Kendrick Hampton's credibility?

"A. Kendrick Hampton attacked his own credibility."

Smith.[9] In that portion of the recording, Corey Turner told Smith to contact Baisden, who had said that he was not present at the time of the shooting, to ask him to testify to contradict Hampton, a state's witness. Hampton had testified that Baisden was at the scene of the crime. Corey Turner also told Smith to locate Colon in order to contradict Hampton. On surrebuttal, Corey Turner put into evidence the entire tape recording of his conversation with Smith. He also offered a tape recording of a conversation between himself and Williams. The state objected to the Williams tape recording, and the trial court sustained the objection. On appeal, Corey Turner challenges the trial court's ruling with respect to the Williams tape.

Charles Turner also testified in his own defense at trial. He testified that he was present at the scene of the crime, but that he did not participate in Woods' murder. Charles Turner testified that, after the shooting, he did not pick up anyone a few blocks from the crime scene, but drove directly to Josephine Mitchell's house. On cross-examination, the state asked Charles Turner whether he had instructed his mother to tell Mitchell what to say during her testimony, and Charles Turner testified that he had not done so. During questioning, the state revealed that it was referring to a tape-recorded

[9] The transcript of the tape-recorded telephone conversation occurring on July 17, 1997, reveals the following discussion:

"[Corey Turner]: That's going to be a rough one, man. I need somebody to, yo, tell him like this, son. I'm starting trial Monday, man. Make Home come down—tell Home to go the courthouse Monday, man. Tell Billy when you see him—right—to tell Home bring Home little ass down to court Monday so he can get a day to come in. Because punk ass nigger lie, he said Home was there, he wasn't there. That's all I need him to come tell him, he wasn't there. That's it. You know what I mean? Simple as that.

"[Smith]: (Inaudible).

"[Corey Turner]: Huh?

"[Smith]: Somebody lie on him though.

"[Corey Turner]: Yeah. [Hampton] did. See all we got to do is make [Hampton]. look like the liar he is and it's all good. See what I'm saying?"

telephone call.[10] On later cross-examination, Charles Turner stated that he could not deny having asked his mother to tell Mitchell what to say, but that he did not recall doing so. Charles Turner also testified that he had talked to Baisden from jail. Charles Turner testified that he did not tell Baisden to deny being present at the crime scene in order to impeach the testimony of Hampton.[11] On cross-examination, Charles Turner acknowledged that he knew that his telephone calls were being recorded by correction officers.

On rebuttal, the state offered portions of audiotapes of Charles Turner's telephone conversations from jail

---

[10] The following colloquy occurred at trial:

"[Assistant State's Attorney]: Did you instruct your mother to tell Mrs. Mitchell, and I quote 'What the fuck to say'?

"[Charles Turner]: No, I don't.

"Q. Did you tell your mother the key things Mrs. Mitchell had to say?

"A. No, I didn't.

"Q. And did she tell—and did you tell your mother if Mrs. Mitchell told your mother that she don't remember, didn't you tell your mother to tell her just say you do?

"A. No, I don't."

[11] The following colloquy occurred at trial:

"[Assistant State's Attorney]: And, sir, other than your attorney and his investigator, did you ever direct any individuals to go find witnesses and talk to them?

"[Charles Turner]: Yes, ma'am, I did.

"Q. And to talk to them?

"A. Yes, ma'am.

"Q. And did you, in fact, talk to [Baisden] directly?

"A. Yes, ma'am, I did.

"Q. And your testimony here today is that [Baisden] was out on Edgewood Street?

"A. Yes, ma'am, it is.

"Q. And do you recall talking to [Baisden] earlier in July—

"A. Yes, ma'am.

"Q.—and telling him to say he wasn't there?

"A. No, ma'am, I didn't.

"Q. Because that way, you could have Kendrick Hampton look like the liar that he is? You don't recall saying that?

"A. I talked to [Baisden]. I asked [Baisden] was he there. [Baisden] told me he wasn't. I asked [Baisden] did the victim's family ever ask him to come to court and lie on me. He indicated to me, no, they didn't."

with his mother and with Baisden.[12] Charles Turner then attempted on surrebuttal to offer the testimony of his investigator, Danielle Lavasseur,[13] to demonstrate that Lavasseur was having difficulty with some witnesses. The trial court refused to admit the evidence, stating that the evidence was "not only collateral, but collateral in the extreme." Charles Turner then offered to testify himself, in order to explain the telephone conversations. The trial court also refused to admit this evidence. Charles Turner then asked the court to play the entire telephone conversations admitted in rebuttal, and the court agreed. On appeal, Charles Turner challenges the trial court's rulings refusing to admit the testimony of Lavasseur and his own testimony.

Rebuttal evidence is that which is offered "to meet new matters raised in [a defendant's case], to contradict prior testimony and to impeach or rehabilitate witnesses . . . ." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 3.3.1, p. 40. Surrebuttal evidence is that which is offered to meet evidence raised in rebuttal. "[O]nly evidence to explain away new facts brought forward by the proponent in rebuttal . . . is properly

---

[12] In the transcript of the tape-recorded telephone conversation with his mother, Charles Turner stated: "But why can't you get [Mitchell's] number? Why you ain't get the number from Ronette, ma, so I could talk to her, so I could tell her what the fuck to say. They telling they people what to say, why can't I tell mines what to say? . . . You should have at least let me talk to her so I can tell her the key things to say. . . ."

In the tape-recorded conversation with Baisden, Charles Turner explained: "[Hampton] said that you was with him and [Colon] was with him . . . . Once you talk to [investigator Danielle Lavasseur] you let her know that your Home wasn't there and that [Hampton] tried to get you to lie with him. . . ."

[13] Charles Turner made the following offer of proof regarding Lavasseur's testimony: Lavasseur's testimony regarding Charles Turner's conversation with Baisden would address "the difficulty she was having finding witnesses [when] she only knew a street name and no address and no other formal information to find the witnesses . . . ." Lavasseur's testimony would also establish that she was having difficulty getting Mitchell to the courthouse because of Mitchell's health problems.

admissible [in surrebuttal]." 6 J. Wigmore, Evidence (4th Ed. 1976) § 1874, pp. 679–80 n.1. "We have previously stated that there is no constitutional right to present surrebuttal evidence. . . . The presentation of surrebuttal evidence is a matter resting squarely within the discretion of the trial court. . . . The defendant must demonstrate some compelling circumstance and the proffered evidence must be of such importance that its omission puts in doubt the achievement of a just result." (Internal quotation marks omitted.) *State* v. *Cavell*, 235 Conn. 711, 729, 670 A.2d 261 (1996).

In the present case, we conclude that the trial court did not abuse its discretion in denying Corey Turner's offer of his tape-recorded conversation with Williams because the tape would not have explained away the state's rebuttal evidence. In the trial court, Corey Turner did not point to anything in the offered tape that would have been helpful to his case with regard to the state's rebuttal evidence. Rather, he argued that the offered tape would substantiate his testimony on cross-examination concerning his conversation with Williams. Bolstering of defense evidence is not permitted on surrebuttal. On appeal, as well, Corey Turner does not point to anything in the Williams tape that would have refuted the implication in the rebuttal evidence that he had attempted through Smith to influence the testimony of Baisden. Moreover, defense counsel had ample opportunity to refute that implication on redirect examination and during the presentation of his case. See *State* v. *Anderson*, 28 Conn. App. 833, 848–49, 614 A.2d 438 (1992), rev'd on other grounds, 227 Conn. 518, 631 A.2d 1149 (1993) (trial court did not abuse discretion by refusing to admit surrebuttal evidence because defendant had opportunity to rehabilitate his credibility on redirect). We conclude that there were no compelling reasons for the trial court to admit Corey Turner's surrebuttal evidence.

We also conclude that there was no compelling reason for the trial court to admit the surrebuttal evidence offered by Charles Turner. Lavasseur's testimony could have established only that she was having difficulty contacting Baisden and bringing Mitchell to court. This evidence would not have refuted the implication in the two tape-recorded conversations presented on rebuttal that Charles Turner was attempting to influence the testimony of Mitchell and Baisden. We conclude that the trial court also properly rejected Charles Turner's request to testify to the same effect as Lavasseur. Moreover, after the state cross-examined Charles Turner about the telephone conversations, he had ample opportunity on redirect to explain the conversations, which he knew had been recorded. See id. We therefore reject the defendants' first claim on appeal.

## II

Each defendant also claims that the trial court improperly permitted the state to vouch for the credibility of Kendrick Hampton, a state's witness, during closing argument.[14] Each claims that the comment interfered with his federal and state constitutional rights against self-incrimination, to present a defense, to a fair and impartial trial, and to due process of law. See footnote 4 of this opinion.

Neither defendant objected to the state's closing argument, and we conclude that the defendants cannot pre-

---

[14] Specifically, the defendants point to the following comment: "Contrast witnesses like Miss Cutler and Mrs. Mitchell versus the state's witnesses who are being asked to tell the truth. You know, it was very interesting, on that last conversation by Mr. Graham about Mrs. Mitchell, oh, well, he was just inquiring of her health; oh, he was inquiring of the ride. . . . He's not worried about how Mrs. Mitchell is going to get there. Make sure she does the right thing. And that theme is repeated over and over again to [Baisden]. You make sure you go in there and tell them that I wasn't there, [Charles Turner] wasn't there. And there is a price that Kendrick Hampton is paying, and that's they've tried to trash his reputation because they knew he cooperated with the police for more than a year."

vail as to this unpreserved constitutional claim. In *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) The defendants here have not clearly been deprived of a constitutional right by the remarks of the state's attorney. Although "[a] prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnesses"; *State* v. *Williams*, 204 Conn. 523, 541, 529 A.2d 653 (1987); we cannnot find such an opinion by the assistant state's attorney in remarks asking the jury to contrast Hampton's testimony with that of other witnesses. Thus, "we cannot say that the prosecutor's remarks and actions in this case were so abusive or prejudicial as to support a claim that the defendant[s] ha[ve] clearly been deprived of a fundamental constitutional right to a fair trial." (Internal quotation marks omitted.) *State* v. *Chace*, 199 Conn. 102, 108, 505 A.2d 712 (1986).

III

In addition to the joint claims, Corey Turner makes several claims regarding his alibi. He argues that, as a sanction for the concededly late disclosure of his alibi, the trial court improperly required him to testify prior to his alibi witness. Corey Turner also claims that the state's cross-examination regarding that late disclosure, and the state's reference to the undisclosed alibi during its closing argument, violated his attorney-client privi-

lege and his right against self-incrimination. We reject each of these claims.

A

Corey Turner claims that the trial court improperly forced him to testify prior to Williams as a sanction for his untimely disclosure of the alibi defense. He argues that requiring him to do so violated his constitutional right against self-incrimination, his right to counsel, his right to present a defense, his right to a fair trial, and his right to due process of law. See footnote 4 of this opinion. We disagree.

The following additional facts are relevant to this claim. On April 16, 1996, the state filed a demand for notice of alibi pursuant to what is now Practice Book § 40-21, then Practice Book § 763.[15] Corey Turner did not file such a notice before the trial began on June 4, 1997. Only after the state had rested its case on July 28, 1997, did Corey Turner file his notice of alibi. The state objected to the presentation of Williams' testimony on grounds of late disclosure of an alibi defense. During a hearing before the trial court as to that objection, Corey Turner began to address the court. The court interrupted him and cautioned him that anything he said was part of the record and "fair game" for cross-examination. Corey Turner then volunteered that, "Friday is when I made up my mind that I would like to testify, being that people are coming in here accusing me of committing this heinous crime. . . . Friday,

---

[15] Practice Book § 40-21 provides: "Upon written demand filed by the prosecuting authority stating the time, date, and place at which the alleged offense was committed, the defendant shall file within twenty days, or at such other time as the judicial authority may direct, a written notice of the defendant's intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi." The text of Practice Book § 763 was the same at the time in question.

downstairs in lockup . . . I told [my attorney] that I will be calling an alibi witness." He offered no other reason for the delay. The trial court concluded that Corey Turner had failed to prove good cause for the delay in disclosure pursuant to what is now Practice Book § 40-24, then Practice Book § 767.[16] When the state indicated that it needed more time to investigate the alibi, the trial court expressed its concern that granting a continuance of the trial for that purpose might result in the loss of some jurors. Because Corey Turner was to testify, the trial court proposed that he and his other witnesses testify before Williams, to give the state time to conduct its investigation. Corey Turner's defense counsel agreed with the proposal, telling the court that "the proposed solution you give is a fair solution, and I would be less than candid if I didn't say you were right, some sanction might be in order for the late disclosure." Corey Turner's counsel also stated, however, that he was concerned that after Corey Turner testified, the trial court might still disallow Williams' testimony. The trial court then ruled that it would permit Williams to testify with the restriction that Corey Turner must testify first. Thereafter, counsel responded, "we have no problem with that, Your Honor." The trial court then stated that its ruling as to Williams might be different if Corey Turner decided not to testify.

While seeking to avoid the exclusion of Williams' testimony, Corey Turner's counsel agreed with, and voiced approval of the trial court's proposed ruling ordering the witnesses to testify in a certain order. We conclude that this was a tactic designed to overcome the late disclosure of the Williams testimony. We will not find that a trial court acted improperly when its

---

[16] Practice Book § 40-24 provides: "For good cause shown, the judicial authority may grant an exception to any of the requirements of Sections 40-21 through 40-23." Except for the internal section references, the text of Practice Book § 767 was the same at the time in question.

action was invited by and approved by a defendant. C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (2d Ed. 1993) § 7.13, p. 7-13, citing *State* v. *Brokaw*, 183 Conn. 29, 33, 438 A.2d 815 (1981).

Moreover, in *State* v. *Boucino*, 199 Conn. 207, 213–14, 506 A.2d 125 (1986), we concluded that "[t]he notice of alibi rules place reasonable conditions on the presentation of alibi evidence and do not impermissibly restrict a criminal defendant's right to compel attendance of witnesses. . . . [H]owever . . . exclusion of alibi witnesses may not be justified in all cases where the defendant has failed to comply with the discovery rules. The trial court must weigh the need for exclusion against the defendant's right to present a defense. . . . The decision is within the sound discretion of the trial court and will turn on the facts of the particular case. Factors which the trial court must consider include: whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance." (Citations omitted; internal quotation marks omitted.) Id., 213–14.

The trial court did not abuse its discretion. Corey Turner's delay in disclosure was substantial, and although he claimed that he did not know of the requirement for disclosure, he was at all times represented by counsel, who had knowledge of the state's request for disclosure. See *Allen* v. *Nissley*, 184 Conn. 539, 543, 440 A.2d 231 (1981) (knowledge of attorney imputed to client). In addition, the state was disadvantaged by the late disclosure because it had completed presenting its case-in-chief and required time to interview Williams and investigate the alibi. The court also was properly

concerned with trial delay and the possible loss of jurors.

We also recognize that under Practice Book § 40-5, then Practice Book § 735A[17] a trial court has broad discretion in sanctioning a defendant for failure to disclose an alibi witness. The trial court could have imposed any sanction it deemed appropriate, including the exclusion of Williams' testimony.

Corey Turner argues that he should prevail, under *Brooks* v. *Tennessee*, 406 U.S. 605, 610–11, 92 S. Ct. 1891, 32 L. Ed. 2d 358 (1972), because forcing a defendant to testify before other witnesses "casts a heavy burden on a defendant's otherwise unconditional right not to take the stand." He also maintains that, had Williams testified before him, he would have been able to assess her testimony and might have decided not to testify himself. This case is distinguishable from *Brooks*, however.

In *Brooks*, the United States Supreme Court held that a Tennessee statute requiring that a defendant testify prior to any other testimony offered for the defense violated a defendant's constitutional right to remain

---

[17] Practice Book § 40-5 provides: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. The judicial authority hearing such a motion may enter such orders and time limitations as it deems appropriate, including, without limitation, one or more of the following:

"(1) Requiring the noncomplying party to comply;

"(2) Granting the moving party additional time or a continuance;

"(3) Relieving the moving party from making a disclosure required by these rules;

"(4) Prohibiting the noncomplying party from introducing specified evidence;

"(5) Declaring a mistrial;

"(6) Dismissing the charges;

"(7) Imposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or

"(8) Entering such other order as it deems proper." The provisions of Practice Book § 735A were the same as those of Practice Book § 40-5.

silent. Id., 612. *Brooks* does not apply here because the order of witnesses resulted solely from Corey Turner's late disclosure of his alibi and his own statements to the court. The trial court's ruling, which reflected the trial court's efforts to avoid a mistrial caused by a loss of jurors, did not force the defendant to testify prior to *any* witnesses, and affected only the order of Corey Turner's last two witnesses, himself and Williams. Corey Turner's defense was not restricted in any other manner, and he had the opportunity to assess the state's evidence as well as his own evidence,[18] except Williams' testimony, prior to testifying himself. Furthermore, there is no indication that the trial court's ruling affected Corey Turner's decision to testify. He indicated on the record that he had decided to testify at the close of the state's evidence, and that his decision to testify in his own defense prompted him to reveal the existence and identity of his alibi witness. Under these circumstances, the trial court did not abuse its discretion in ordering Corey Turner to testify prior to Williams' testimony.

B

Corey Turner next claims that the state's cross-examination of him regarding the late disclosure of his alibi violated his attorney-client privilege. He also claims that the cross-examination and the state's closing argument violated his right against self-incrimination under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Lastly, Corey Turner argues that the state failed to establish the proper foundation for cross-examining him regarding the late disclosure. We reject each of these claims.

1

Corey Turner claims that the state's questioning regarding his alibi violated his attorney-client privilege.

[18] Corey Turner called five witnesses, who testified prior to both his and Williams' testimony.

The following additional facts are relevant to this claim. On Friday, July 25, 1997, after the state's presentation of its case-in-chief, Corey Turner told his attorney that he wanted to call an alibi witness to the stand. He also indicated that he would testify himself. The next day, Corey Turner provided his attorney with the identity and address of the alibi witness, Williams. Corey Turner's defense counsel then orally informed the state of the alibi witness' existence and identity. During cross-examination, the state asked Corey Turner why he had not told anyone about his alibi until recently. His counsel objected, on the basis of the attorney-client privilege, and the trial court ordered the state to limit the questions to Corey Turner's filing of the notice of alibi.[19]

"The attorney-client privilege protects communications between client and attorney when made in confidence for the purpose of seeking or giving legal advice.

---

[19] The following colloquy occurred at trial:

"[Assistant State's Attorney]: And isn't it a fact, sir, that only this past Saturday you announced that you had an alibi? . . .

"[Defense Counsel]: Objection, Your Honor. That invades the attorney/client privilege. . . .

"The Court: No. You'll need to—you'll need to exclude any communications to counsel, but if you want to ask about whether a notice of alibi was filed or given to the prosecution, you can certainly do that, subject to an objection that changes my mind.

"[Assistant State's Attorney]: [Corey] Turner, you're aware that the state filed a demand for alibi as far back as April of '96. Is that correct?

"[Defense Counsel Michael J. Graham]: Objection.

"[Corey Turner]: I'm not aware of that. . . .

"[Assistant State's Attorney]: But the first time you chose to notify anyone by a motion was by fax to my office on Saturday and then in court Monday morning. Is that correct?

"[Defense Counsel Leon M. Kaatz]: Objection, Your Honor. That invades attorney-client privilege.

"The Court: You need to talk about the filing of notice to the state, not the first time he told anyone.

"[Assistant State's Attorney]: Okay. . . .

"[Assistant State's Attorney]: Sir, is it your testimony that you were never aware of the fact that the state demanded an alibi notice?

"[Corey Turner]: That is my testimony."

*State* v. *Cascone*, 195 Conn. 183, 186, 487 A.2d 186 (1985)." *Ullmann* v. *State*, 230 Conn. 698, 711, 647 A.2d 324 (1994). "This privilege was designed, in large part, to encourage full disclosure by a client to his or her attorney so as to facilitate effective legal representation." *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 48, 730 A.2d 51 (1999). The privilege extends only to the substance of communications, however. See *Ullmann* v. *State*, supra, 712 (fact that defendant and attorney met on certain date not privileged); *State* v. *Manning*, 162 Conn. 112, 120, 291 A.2d 750 (1971) (location where conversations were held not privileged information).

We conclude that Corey Turner's attorney-client privilege was not violated in this case, as the trial court limited the scope of the questioning and precluded any inquiry into the substance of Corey Turner's conversations with his attorney. The trial court permitted only questions on the timing of Corey Turner's notice of alibi, which was a matter of fact and not a communication protected by the attorney-client privilege. To the extent that the questions dealt with Corey Turner's discourse to his attorney, Corey Turner had volunteered that his attorney knew of the alibi, opening the door to the questions concerned with the timing of that disclosure. "[I]t has been widely held that voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege . . . ." *Weil* v. *Investment/Indicators, Research & Management*, 647 F.2d 18, 24 (9th Cir. 1981).

2

Corey Turner also claims that the state's cross-examination improperly exposed the jury to the fact that he remained silent after receiving *Miranda* warnings, in violation of *Doyle* v. *Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). He further claims that

the state improperly commented on his post*Miranda* silence during its closing argument to the jury. Corey Turner argues that these actions violated his right against self-incrimination and his right to due process. See footnote 4 of this opinion. We disagree with both claims.

The following additional facts are relevant to these claims. During cross-examination, the state asked Corey Turner the first time that he had made his alibi public. He answered that the first time he had made it public to "you" was that day or Monday of that week. Thereafter, he was asked whether he had told the police about his alibi. Corey Turner's counsel did not object to this question, and Corey Turner replied that he never had spoken to the police.[20]

---

[20] The following colloquy occurred at trial:

"[Assistant State's Attorney]: Sir, you've testified that you've known you've had this alibi from the first day. Is that correct?

"[Corey Turner]: That's correct.

"[Assistant State's Attorney]: But from the time that you were arrested to the time of today or until Monday, actually—the first time you made that public was on Monday?

"[Corey Turner]: The first time I made it public to you.

"[Assistant State's Attorney]: To the police? Did you make it public to the police?

"[Corey Turner]: I never spoke to the police.

"[Assistant State's Attorney]: You were never brought back to Connecticut?

"[Corey Turner]: Yes, but I didn't speak to the police.

"[Assistant State's Attorney]: And you weren't booked on these charges?

"[Corey Turner]: I was booked on the charges, but I didn't speak to the police.

"[Assistant State's Attorney]: And at no time did you have anyone go to the police on your behalf or go to the prosecutor's office on your behalf to tell us where you were?

"[Corey Turner]: What difference would it have made? I was going to be going to trial regardless, so I didn't—I wasn't aware that it was some requirement as far as to disclose that information to you ahead of time. If I had been aware of that, I would have done so in the event that I did decide to testify, but being that I wasn't sure if I was going to testify or not—

"[Assistant State's Attorney]: You decided to keep it to yourself?

"[Corey Turner]: No, I didn't keep it to myself. I just didn't let you know, you know. My attorney knew."

During its closing argument, the state made the following comment: "They didn't go to the family and say it's all wrong, they didn't go to the police and say it's all wrong. They just avoided everything and waited to come here and come up with an alibi, and waited to come up here and attack Kendrick Hampton." Corey Turner made no objection to these remarks.

Corey Turner argues that the state may not use a defendant's silence subsequent to receiving *Miranda* warnings for impeachment purposes. See id. Because Corey Turner did not object to this question at trial, we review his claim under *State* v. *Golding*, supra, 213 Conn. 233. We conclude that the state's cross-examination in this case did not clearly violate Corey Turner's right to due process or right against self-incrimination under *Doyle* v. *Ohio*, supra, 426 U.S. 619. Silence as a result of a decision to exercise one's fifth amendment right against self-incrimination during custodial interrogation under *Miranda* v. *Arizona*, supra, 384 U.S. 439, is distinct from a failure to comply with the alibi disclosure requirements of Practice Book § 40-21, then Practice Book § 763.

In *Williams* v. *Florida*, 399 U.S. 78, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970), the United States Supreme Court held that a notice of alibi requirement does not violate the privilege against self-incrimination. The court noted in *Williams*, "[n]othing in such a [dislosure] rule requires the defendant to rely on an alibi . . . . [This matter is] left to his unfettered choice." Id., 84. There is therefore no compulsion such as may exist during police interrogation of a defendant who is in custody. The court also noted that the existence of an alibi might well not be a testimonial statement relating to the historical facts of the crime. Id., 86 n.17. It is, rather, a statement relating solely to what a defendant proposes to do at trial. Id.

In this case, Corey Turner made a voluntary choice, in view of the strength of the case against him, to testify, and to rely on an alibi. We reject his argument that *Doyle* v. *Ohio*, supra, 426 U.S. 619, blocks the effort by the state to demonstrate that Corey Turner's alibi was recently fabricated. The questions dealt solely with Corey Turner's failure to disclose his alibi, and did not involve Corey Turner's postarrest silence while he was in custody after receiving *Miranda* warnings. Furthermore, the question of whether Corey Turner informed the police of his alibi attempted to clarify his answer on cross-examination, which implied that he had told others about his alibi. We conclude that the questioning concerning his late alibi disclosure did not violate the fifth amendment rights referred to in *Miranda* warnings.

We similarly conclude that the state's closing argument did not clearly violate Corey Turner's right to due process or right against self-incrimination under *Doyle* v. *Ohio*, supra, 426 U.S. 619. As with the state's questions on cross-examination, the closing argument addressed Corey Turner's failure to disclose his alibi, and was not a comment on any post*Miranda* custodial silence. The state merely suggested that, if the alibi were true, Corey Turner would have tried to exculpate himself of the crime prior to trial. Thus, we conclude that the state's comments during closing argument were not a violation of *Doyle*.

3

Corey Turner also claims that the state failed to establish the proper foundation for cross-examining him regarding the late disclosure of his alibi. Relying on *State* v. *Bryant*, 202 Conn. 676, 703–704, 523 A.2d 451 (1987), he argues that the state was required to show that he was aware of his obligation to disclose his alibi within a prescribed period of time, and that his failure to

disclose was not the result of advice from his attorney. Without such a foundation, Corey Turner contends, his late disclosure was irrelevant, and the inference that his alibi was a recent fabrication was unfounded. We disagree.

In *State* v. *Bryant*, supra, 202 Conn. 705, we stated that "[the state] may lay a proper foundation for this type of cross-examination [of an alibi witness] by first demonstrating that the witness was aware of the nature of the charges pending against the defendant, had reason to recognize that he possessed exculpatory information, had a reasonable motive for acting to exonerate the defendant and, finally, was familiar with the means to make such information available to law enforcement authorities. . . . A proper foundation may better aid the trier of fact in determining whether the testimony of such a defense witness is an accurate reflection of the truth or is, instead, a recent fabrication." (Citations omitted; internal quotation marks omitted.)

We conclude that the state established a proper foundation to cross-examine Corey Turner as to his late disclosure of his alibi. Corey Turner testified that: he was aware of the alibi from the beginning of the case; he knew that it was exculpatory; and he was very interested in the outcome of the case. Although Corey Turner denied knowledge of the disclosure requirements, he was at all times after his arrest represented by counsel. Corey Turner volunteered on the stand that he had told his attorney about the existence of the alibi on Friday, July 25, 1997, after the state had presented its case-in-chief. The jury could reasonably have inferred that Corey Turner knew that he should have told his attorney about the existence of an alibi and would have done so very early on to exonerate himself. We conclude that the state established the proper foundation for this line of questioning.

## IV

Corey Turner next claims that the trial court improperly denied his motion for severance. Specifically, he argues that the joinder of his trial with that of Charles Turner was prejudicial because it allowed the jury to consider, in reaching its verdict against him, evidence admitted against Charles Turner that would not have been admissible against him alone.

The following additional procedural history is relevant to this claim. On November 18, 1996, the state moved to consolidate the trials of Corey Turner and Charles Turner. Corey Turner then moved to sever his case from that of Charles Turner. He argued that having a joint trial with Charles Turner, who was positively identified as having been at the scene of the crime, would substantially prejudice him because it was likely that the jury would convict him because of a tendency to link the brothers together. Corey Turner also argued that he would be prejudiced if the jury learned that Charles Turner's street name was "Homicide." The trial court granted the state's motion to consolidate on November 27, 1996. The trial court reasoned that Corey Turner and Charles Turner should be tried together because the same evidence would be presented in both cases and the parties had not demonstrated substantial prejudice from consolidating the trials. Prior to trial, Corey Turner renewed his motion to sever, and the trial court again denied the motion. Prior to sentencing, Corey Turner again renewed his motion to sever, and the trial court denied it for the third time.

The rules that govern motions for severance are well established. "[W]hether to consolidate or sever the trials of defendants involved in the same criminal incident lies within the sound discretion of the trial court. . . . Ordinarily justice is better subserved where parties are tried together. . . . Joint trials of persons jointly

indicted or informed against are the rule, and separate trials the exception resting in the discretion of the court. . . . A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials. . . . *State* v. *White*, 229 Conn. 125, 158–59, 640 A.2d 572 (1994); accord *State* v. *Walton*, 227 Conn. 32, 56, 630 A.2d 990 (1993); *State* v. *Smith*, 201 Conn. 659, 668–69, 519 A.2d 26 (1986); see also *State* v. *Vinal*, 198 Conn. 644, 648, 504 A.2d 1364 (1986).

"The test for the trial court is whether substantial injustice is likely to result unless a separate trial be accorded. *State* v. *White*, supra, 229 Conn. 158. [W]e will reverse a trial court's ruling on joinder only where the trial court commits an abuse of discretion that results in manifest prejudice to one or more of the defendants. *State* v. *Vinal*, supra, 198 Conn. 649. The discretion of the court is necessarily exercised before the trial begins and with reference to the situation as it then appears to the court. *State* v. *Smith*, supra, 201 Conn. 669; accord *State* v. *McCarthy*, 130 Conn. 101, 103, 31 A.2d 921 (1943). Therefore, we must review the trial court's decisions to grant the state's motion for joinder and to deny the defendants' motions for severance based upon the evidence before the court at the time of the motions." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 620–21, 737 A.2d 404 (1999).

Applying this standard to the facts of this case, we conclude that the trial court did not abuse its discretion in denying Corey Turner's motions for severance. The

trial court properly determined that Corey Turner would not suffer undue prejudice from the introduction of evidence in the case against Charles Turner that would not have been admissible solely against Corey Turner. Although evidence that is probative of one defendant's guilt but technically admissible only against a codefendant might present a risk of prejudice from a joint trial, such risk must be compelling in order to warrant severance of the trials.

"A joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once. . . . [W]here proof of the charges against the defendants is dependent upon the same evidence and alleged acts . . . severance should not be granted except for the most cogent reasons." (Citation omitted; internal quotation marks omitted.) Id., 622. The evidence that Charles Turner was at the scene of the crime, that his nickname was "Homicide," and that he might have tried to influence witnesses prior to trial are not cogent reasons for severing his trial from that of Corey Turner.

Moreover, any possible risk of prejudice was mitigated by the trial court's instructions to the jury in this regard. The trial court instructed the jury to "keep in mind that we have been trying two separate cases. . . . [Y]our findings in one case do not in themselves establish a basis for similar findings in the other case. For all practical purposes, the defendants are to be considered to be on trial separately; that is to say, one may be found guilty and the other not guilty, or both may be found guilty, or both may be found not guilty according to your findings upon the evidence and the law as stated by the court. . . . Each defendant is to be considered as if he were on trial alone for the offense

for which he stands charged." We presume, in the absence of some indication to the contrary, that the jury followed those instructions and considered the case of each defendant separately. See, e.g., *Mulligan* v. *Rioux*, 229 Conn. 716, 737, 643 A.2d 1226 (1994). In light of the evidence and the jury instructions, we conclude that the trial court acted within its discretion in consolidating, and then refusing to sever, the defendants' trials.

V

Corey Turner next claims that the trial court violated his statutory and constitutional rights to a speedy trial when his trial was delayed because Charles Turner's attorney was unavailable to begin trial. We are not persuaded.

The following additional facts are relevant to this claim. Corey Turner was arrested and incarcerated on March 14, 1996. On November 13, 1996, Corey Turner filed a motion for a speedy trial. The trial court denied Corey Turner's motion, reasoning that he was not eligible to file for a speedy trial until January 8, 1997. The state then filed a motion to consolidate the trials of Corey Turner and Charles Turner, which the court granted. On January 29, 1997, Corey Turner again filed a motion for a speedy trial. At that time, Charles Turner's attorney was unavailable for trial for the next five months, until June, 1997. The trial court denied Corey Turner's motion for a speedy trial, reasoning that, under Practice Book § 43-40 (4), then Practice Book § 956C,[21]

---

[21] Practice Book § 43-40 provides in relevant part: "The following periods of time shall be excluded in computing the time within which the trial of a defendant charged by information with a criminal offense must commence pursuant to Section 43-39 . . . .

"(4) A reasonable period of delay when the defendant has been joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." The language of Practice Book § 956C (d), which became Practice Book § 43-40 (4), was the same at the time in question.

the time that Charles Turner's attorney was unavailable was a reasonable period of delay that could be excluded from the computation of when Corey Turner's trial must begin. The trial of Corey Turner and Charles Turner then began on June 4, 1997.

A

On appeal, Corey Turner argues that the fifteen month delay from his arrest until trial began violated his constitutional right to a speedy trial. See footnote 4 of this opinion. We disagree.

The sixth amendment guarantee of a speedy trial is a fundamental right made applicable to the states through the fourteenth amendment to the United States constitution. *Klopfer* v. *North Carolina*, 386 U.S. 213, 223, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). In *Barker* v. *Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), the United States Supreme Court articulated a balancing test for determining when a defendant's constitutional right to a speedy trial has been violated. The four factors to be considered in such a determination are: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." Id., 530. Balancing these factors, we conclude that, while the delay in this case was substantial, the reason behind it was neutral and Corey Turner has failed to demonstrate that he suffered any prejudice from it. We therefore conclude that Corey Turner was not deprived of his constitutional right to a speedy trial.

Corey Turner's trial began fifteen months after he was arrested and incarcerated. This was a substantial delay. See *State* v. *Ortiz*, 252 Conn. 533, 568, 747 A.2d 487 (2000) (fourteen months substantial); *State* v. *Morrill*, 197 Conn. 507, 523, 498 A.2d 76 (1985) (nineteen months); *State* v. *Johnson*, 190 Conn. 541, 544–45, 461 A.2d 981 (1983) (sixteen months); *State* v. *McCarthy*, 179 Conn. 1, 6–7, 425 A.2d 924 (1979) (nineteen months).

The reason for the delay, however, was the state's legitimate interest in joining Corey Turner's trial with that of Charles Turner. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker* v. *Wingo*, supra, 407 U.S. 531. Judicial economy, similar to docket congestion, is a neutral justification for trial delay. Last, Corey Turner fails to show how he was prejudiced by the delay. He claims that he suffered anxiety and stress from his loss of freedom awaiting trial. This generalized claim of anxiety suffered during incarceration, however, does not rise to the level of a constitutional violation of his right to a speedy trial. See, e.g., *State* v. *Flowers*, 198 Conn. 542, 553, 503 A.2d 1172 (1986) (when defendant was forced to spend twenty-three out of every twenty-four hours confined in his cell, was ineligible for work assignment and was so stressed by jail conditions that he sought medical attention, constitutional right to speedy trial was not violated). Corey Turner also claims that he suffered prejudice from the delay because numerous witnesses had lapses in memory due to the passage of time before trial. Nevertheless, Corey Turner has failed to present any specific instances of memory loss that were crucial to his case, and he has not demonstrated the inability to obtain any witnesses or any exculpatory evidence because of the delay. See *State* v. *Morrill*, supra, 527–28 (claim relying on simple passage of time cannot, without more specific showing, be said to prejudice defendant any more than state). We therefore conclude that Corey Turner has failed to demonstrate that he suffered any prejudice from the fifteen month delay.

### B

Corey Turner also argues that the trial court's determination that the unavailability of Charles Turner's attorney was a reasonable period of excludable time under Practice Book § 43-30 (4), then Practice Book § 956C (d), violated his statutory right to a speedy trial. We disagree.

General Statutes § 54-82m[22] authorizes the judges of the Superior Court to make rules providing a procedure to assure a speedy trial to all defendants. The statute requires that any such rules mandate that trials occur within twelve months after a defendant is charged with a crime, except that if a defendant is incarcerated while awaiting trial, the trial must occur within eight months. The statute further provides that the charges against a defendant must be dismissed if that defendant is not brought to trial within thirty days of a motion for a speedy trial filed after the expiration of the eight or twelve month time period. Practice Book §§ 43-39 through 43-43, then Practice Book §§ 956B through

---

[22] General Statutes § 54-82m provides: "In accordance with the provisions of section 51-14, the judges of the Superior Court shall make such rules as they deem necessary to provide a procedure to assure a speedy trial for any person charged with a criminal offense on or after July 1, 1985. Such rules shall provide that (1) in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later, except that when such defendant is incarcerated in a correctional institution of this state pending such trial and is not subject to the provisions of section 54-82c, the trial of such defendant shall commence within eight months from the filing date of the information or indictment or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information or indictment shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1)."

956F, implement this statutory scheme,[23] with Practice Book § 43-40 creating certain instances of "excludable time" that are not used in calculating whether a time limit has expired. Practice Book § 43-40 provides that "[t]he following periods of time shall be excluded in computing the time within which the trial of a defendant . . . must commence . . . (4) A reasonable period of delay when the defendant has been joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted. . . ."

We first conclude as a matter of law that the trial court properly determined that the time Charles Turner's attorney was unavailable was excludable time for computing the commencement of Corey Turner's trial. At the time of Corey Turner's motion for a speedy trial, the defendants' trials had been joined and no motion

---

[23] Practice Book § 43-39 provides in relevant part: "(c) Except as otherwise provided herein and in Section 43-40, the trial of a defendant charged with a criminal offense on or after July 1, 1985, shall commence within twelve months from the filing of the information or from the date of the arrest, whichever is later.

"(d) The trial of such defendant shall commence within eight months from the filing of the information or from the date of the arrest, whichever is later, if the following conditions are met:

"(1) the defendant has been continuously incarcerated in a correctional institution of this state pending trial for such offense; and

"(2) the defendant is not subject to the provisions of General Statutes § 54-82c. . . ." The comparable rule at the time in question was Practice Book § 956B (b).

Practice Book § 43-41 provides: "If the defendant is not brought to trial within the applicable time limit set forth in Sections 43-39 and 43-40, and, absent good cause shown, a trial is not commenced within thirty days of the filing of a motion for speedy trial by the defendant at any time after such time limit has passed, the information shall be dismissed with prejudice, on motion of the defendant filed after the expiration of such thirty day period. For the purpose of this section, good cause consists of any one of the reasons for delay set forth in Section 43-40. When good cause for delay exists, the trial shall commence as soon as is reasonably possible. Failure of the defendant to file a motion to dismiss prior to the commencement of trial shall constitute a waiver of the right to dismissal under these rules." The comparable rule at the time in question was Practice Book § 956D.

to sever had been granted. The fact that Corey Turner had moved for severance is irrelevant, as the Practice Book section refers only to whether "no motion for severance *has been granted*." (Emphasis added.) Practice Book § 43-40 (4). We conclude that the time that Charles Turner's attorney was unavailable was excludable time under Practice Book § 43-40 (4), then Practice Book § 956C (d). See also *State* v. *Ortiz*, supra, 252 Conn. 565–68.

We also conclude that the trial court did not abuse its discretion in determining that the five months constituted a "reasonable period of delay" under Practice Book § 43-40 (4). See *State* v. *Flowers*, supra, 198 Conn. 545. In *State* v. *Brown*, 242 Conn. 389, 402, 699 A.2d 943 (1997), we held that a five week delay of trial after the defendant's motion for a speedy trial was reasonable, even though there was no excludable time under the Practice Book provisions, because the defendant's own attorney was unavailable for trial until that time. The court reasoned that the Practice Book provisions "cannot be read to preclude the trial court's inherent power to make a reasonable accommodation in an individual case between the right to a speedy trial and the unavailability of the defendant's attorney." Id., 407. Here, unlike in *Brown*, the delay that resulted from the unavailability of Charles Turner's attorney qualified as excludable time under Practice Book § 43-40 (4). Although five months was a longer delay than the one at issue in *Brown*, it was not an unreasonable amount of time such that the trial court abused its discretion in permitting it. Whether a delay is reasonable depends upon the facts of each case, and the trial court here properly concluded that the five month delay was not so lengthy that it warranted severing the trials. Thus, we reject Corey Turner's claim that his statutory right to a speedy trial was violated.

## VI

Charles Turner also claims that the many instances of error with respect to Corey Turner's alibi witness harmed his own defense, in violation of his rights against self-incrimination, to present a defense, to a fair and impartial trial, and to due process of law. See footnote 4 of this opinion. Specifically, Charles Turner argues that, because their defenses were intertwined, impeaching Corey Turner's alibi necessarily impeached Charles Turner's defense. Because we have rejected Corey Turner's claims of error with respect to his alibi; see part III of this opinion; we similarly reject Charles Turner's claim that his defense was prejudiced.

## VII

Charles Turner claims that the trial court improperly denied his motions for judgment of acquittal because the state had failed to produce sufficient evidence to establish beyond a reasonable doubt that he had the requisite intent to kill the victim, as required for a conviction of accessory to murder, and that he had the intent to inflict serious physical injury, as required for a conviction of accessory to first degree assault. We disagree.

At the close of the state's case, Charles Turner moved for judgment of acquittal based on insufficient evidence. The trial court denied the motion. After his conviction, and prior to the imposition of a sentence, Charles Turner renewed his motion for judgment of acquittal, and the trial court denied that motion.

"In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the

cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Traficonda*, 223 Conn. 273, 278, 612 A.2d 45 (1992)." (Internal quotation marks omitted.) *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993).

The statutory provision governing accessory liability, General Statutes § 53a-8, provides in relevant part that " '[a] person, acting with the mental state required for the commission of an offense, who . . . intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct . . . as if he were the principal offender.' We have previously stated that a conviction under § 53a-8 requires [the state to prove the defendant's] dual intent . . . [first] 'that the accessory have the intent to aid the principal and [second] that in so aiding he intend to commit the offense with which he is charged.' " *State* v. *Foster*, 202 Conn. 520, 525–26, 522 A.2d 277 (1987). In order to convict Charles Turner of accessory to murder and accessory to assault in the first degree, the jury had to conclude that Charles Turner had the intent to aid Corey Turner in those crimes and the intent to commit the crimes themselves.

"Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. *State* v. *Greenfield*, supra, [228 Conn.] 77. Therefore, intent is often inferred from conduct; id., 76; and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. *State* v. *Raguseo*, [225 Conn. 114, 119, 622 A.2d 519 (1993)]. This does not require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. [*State* v. *Crafts*, 226 Conn. 237, 244, 627 A.2d 877 (1993)]. Nevertheless,

because intent to cause the death of a person is an element of the crime; *State* v. *Raguseo*, supra, 120; that intent must be proven beyond a reasonable doubt. *Patterson* v. *New York*, 432 U.S. 197, 204, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Furthermore, [i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . *State* v. *Raguseo*, supra, 120." (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126–27, 646 A.2d 169 (1994).

The jury reasonably could have concluded that Charles Turner had both the intent to kill and the intent to cause serious physical injury to the victim. At 8:30 p.m. on the night of the shooting, both Charles Turner and Corey Turner were seen driving an Oldsmobile along Homestead Avenue. Soon thereafter, Charles Turner was observed driving alone down Homestead Avenue. After parking the car, Charles Turner stood at the corner of Homestead Avenue and Edgewood Street directly across from the victim. Powell testified that it was an unusual place for Charles Turner to be standing. Hampton stated that Charles Turner appeared to be "dancing around." Corey Turner then approached from behind the buildings and began shooting at the victim. The jury reasonably could have concluded that Charles Turner's unusual behavior was meant to distract the victim and bystanders while Corey Turner approached from behind to shoot the victim.

Moreover, the jury reasonably could have inferred that Charles Turner gave Corey Turner the weapon that was used in the shooting. Powell testified that the shooter used a black, nine millimeter weapon that appeared to be a Ruger. The weapon used by the shooter

was of the same type that had been in Charles Turner's possession the week before.

Finally, the jury could have inferred Charles Turner's intent from his reaction to the shooting. A jury reasonably can infer an intent to kill "from [a] defendant's failure to attempt to aid [the victim] or to show concern for [his] welfare following the shooting." *State* v. *Mejia*, 233 Conn. 215, 225, 658 A.2d 571 (1995). Charles Turner himself testified that he "knew [the victim] very well," they were "good friends" since childhood and that there was no "bad blood," "feuding" or "bad words" between them. Despite his claims that they had a close relationship, Charles Turner drove away immediately after the victim had been fatally shot. Shortly thereafter, Charles Turner was observed picking up Corey Turner nearby. It was reasonable for the jury to infer from Charles Turner's lack of concern that he intended to cause serious physical injury or kill the victim.

We reject Charles Turner's contention that the jury's verdict was based solely on the evidence that he drove the car that picked up Corey Turner. From the cumulative force of all the evidence of Charles Turner's conduct before, during and after the shooting, the jurors reasonably could have found that he was guilty of both accessory to murder and accessory to first degree assault.

The judgments are affirmed.

In this opinion the other justices concurred.