## THE STATE v. RECTOR, *Appellant.*[*]

### Division One, November 9, 1894.

1. **Pleading, Criminal**: INDICTMENT: MURDER. An indictment for murder which alleges that defendant "some heavy weapon or instrument," to the jurors unknown, "did forcibly strike and beat," etc., breaking the neck of the deceased, by the omission of the word "with," fails to charge with what the homicidal act was done, and is, for that reason, defective. PER SHERWOOD, J.

2. ———: ———: FELONY. In all prosecutions for felonies, everything constituting the offense must be pleaded with certainty and clearness; nothing must be left to be implied. PER SHERWOOD, J.

[*]Not received in time to be reported in chronological order.

The State v. Rector.

3. ———: ———: MURDER. An indictment for murder in the first degree, which concludes with the charge that the defendant "in manner and form, aforesaid, did kill and murder," is insufficient. It should conclude with "and so the jurors, aforesaid, upon their oath, aforesaid, do say that the said W. him the said C., in manner and form aforesaid, and by the means .aforesaid, did feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, kill and murder, against the peace and dignity of the state."

4. ———: ———: CONCLUSION. Any material omission in the conclusion of an indictment is as fatal as if occurring in any other part of it.

5. **Practice, Criminal**: EVIDENCE NECESSARY TO CONVICT: FLIGHT: PRESUMPTION. Evidence of flight, standing alone, is not sufficient to justify a conviction. The accused is entitled to the legal presumption in favor of innocence, which, in doubtful cases, is sufficient to turn the scale in his favor. A mere preponderance of evidence is not sufficient, nor is any weight of preponderent evidence, unless it generate full belief to the exclusion of all reasonable doubt.

6. **Criminal Law**: PRINCIPAL AND ACCESSORY: SELF-DEFENSE. When the principal in a prosecution for murder is justifiable upon the ground of self-defense, no culpability can attach to one charged with aiding and abetting him.

*Appeal from Perry Circuit Court.*—HON. JAMES D. FOX, Judge.

REVERSED.·

The defendant was tried for the crime of murder in the first degree, resulting, after a severance granted, in conviction of the second degree of that offense; punishment, ten years in the penitentiary.

The charging part and conclusion of the indictment under which the trial occurred are as follows:

"That Henry Willis on the first day of June, A. D. 1892, at the county of Perry and state of Missouri, in and upon the body of one Charles Cargile, then and there being, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did make an assault, and that the said Henry Willis some heavy weapon or instrument, to these jurors unknown, which said instrument or weapon, he, the said

Henry Willis, in his hand, then and there had and held, then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did forcibly strike and beat the said Charles Cargile in and upon the body of the said Charles Cargile, fracturing and breaking the neck of the said Charles Cargile, giving to him, the said Charles Cargile, a mortal injury, of which said mortal injury he, the said Charles Cargile, did then and there instantly die; and that John Rector then and there, feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, was present, aiding, helping, abetting, comforting, assisting and maintaining the said Henry Willis in the felony and murder aforesaid, in manner and form, aforesaid, to do and commit.

"And the jurors aforesaid, upon their oath aforesaid, do say that the said Henry Willis and John Rector him, the said Charles Cargile, in manner and form aforesaid did kill and murder, against the peace and dignity of the state.          JOHN B. DAVIS,
"Prosecuting Attorney."

The substance of the testimony in this case as to how Cargile came to his death is embodied in the following statement Sheriff Anderson testified to as having been made by Willis to him:

"L. M. Anderson being produced, sworn and examined on the part of the state, testified as follows: I am the sheriff and jailer of Perry county, and as such have had defendant and Henry Willis in my custody since their commitment to jail on the charge of murdering Charles Cargile. Rector made no statement to me about the difficulty with Cargile, but Willis made a statement in the presence of Rector. Willis said that they (meaning the Rector family including Willis) had been run out of their shanty by the high water, and that on the morning of the day Cargile died (the water

having gone down before that) he and John Rector, Ed. Rector and old man Rector went up to the cabin to clean it out. That when they got there old man Cargile was there. That Cargile said to Willis, 'It looks pretty luxious here.' That Willis replied, 'If you call mud and water luxious, I guess it is.' That Cargile then said to Willis, 'Did you see any of my posts down here?' That Willis answered, 'There aint any of your posts here.' That Cargile then said to Willis, "You are a damned lying son of a bitch.' That at the time of saying this Cargile drew his knife. That Willis then ran at Cargile and hit him with his fist on the right side of the neck. That Willis then ran back and took the hoe off of Rector's shoulder and hit Cargile on the back with it as Cargile was coming at him with an open knife, and that he then ran after Cargile as the latter started to run and threw the hoe at him and hit him on the hip. That Cargile, after running a little piece, turned around and said to Willis, 'You've played hell.' Willis made the statements detailed by me a few days after he was put in jail, some time in the fore part of June, 1892, and has made the same statement to me at different times since then. He made the statement of the occurrence given by me before he had had any opportunity of seeing and consulting a lawyer. He and Rector had no counsel until the court appointed counsel at the October term, 1892."

The testimony of Edward Rector, a brother of defendant, in its material portions is as follows: "On the morning of the day Cargile died, my father, William Rector, my brother, John Rector, Henry Willis and myself, went to our shanty to clean it out so that we could move back into it. We had been run out of the shanty some weeks before that by high water and had been camping at a high place in a tent some three or four hundred yards south of the shanty.

We took a hoe along with us to scrape the mud out of the shanty. John Rector carried the hoe and walked in front. Willis was close behind him, and my father and I last. When we got to the shanty we found Charles Cargile there. He was standing by a pen about fifteen or twenty steps from the shanty. He spoke to Willis and Willis stopped to talk to him. My father and I passed by them and went on into the shanty. John Rector, the defendant, also passed by them and came as far as the shanty door. About the time that we got into the shanty I heard Cargile call Henry Willis a damned lying son of a bitch, and threaten to cut his guts out. I then looked out of the shanty door and saw Henry Willis backing toward the shanty, while Cargile was coming at him with his knife open. Willis backed quickly until he reached the front of the shanty door where John Rector was standing with the hoe in his hand. Willis then grabbed the hoe out of John's hands and struck Cargile with it on the left side. Cargile then turned to run and Willis took two or three steps after him, and threw the hoe at him, striking him on the hip. Cargile continued to run until he got inside of the field, when he turned and said to Willis: 'You've played hell, God damn you!' The hoe with which Willis struck Cargile was a light garden hoe. On the day before this difficulty, John Long told Henry Willis and John Rector in my presence that Charles Cargile, on the Saturday previous, had said he intended to shoot them (Rector and Willis) on sight. John Rector, the defendant, took no part in the difficulty mentioned by me. He did not give Willis the hoe to strike Cargile with. Willis snatched it from him. If Willis had not struck Cargile with the hoe, Cargile would have cut him with the knife. Cargile was close to him and coming at him as he backed and struck with the hoe. Cargile held the

knife open and drawn ready to strike. It was a long blade. (Here witness is shown the knife identified by Willie Cargile and others.) That looks like the knife Cargile had. He had the big blade open when he was coming at Willis. If Willis hadn't backed very fast, Cargile would have cut him before he got hold of the hoe. I did not see Cargile fall in the field after the difficulty was over. I went back into the shanty and helped clean it out. The door of the shanty is on the south side. Cargile ran around the house and went north towards his house after the fight. I did not see Willis hit Cargile with his fist. I suppose this took place before I looked out of the shanty. John Rector and Henry Willis helped us rake mud out of the shanty for about an hour after the fight was over. They then took the boat and said they were going to Peter Tucker's. They came back about 4 o'clock, P. M. During the day we got moved back into the shanty. John and Willis stayed around the shanty that evening and night. We heard two shots fired at about 8 o'clock. We all went to bed that evening at about an hour and a half after sundown. When we heard the shots we looked out but did not see or hear anything. * * * At about four o'clock on the afternoon of the day after the inquest, John Rector, Henry Willis and I started to Peter Tucker's after some tobacco. We were in the boat and rowing across the bayou when we heard two shots, one right after the other, close to us, and heard the shot strike around us. One shot passed through my hat. We looked and saw several men coming toward us. After the shooting commenced, Willis said, 'Let's jump out, or they will hit us.' Accordingly, John Rector and Willis jumped out and waded through the water. I staid in the boat. When the shooting commenced John was rowing, Willis was sitting in the stern, and I in the bow of the boat.

The first I heard was the shooting. They never halted us before they shot. I did not hear anybody halloo halt until after two shots were fired. I did not know anybody except me and John and Henry were around until I heard the guns go off and heard the shot hitting around us. John and Henry jumped out and ran in order to keep from being shot."

The testimony of Willis, the co-indictee of defendant, in so far as important to be quoted, is this: "On the morning of the difficulty at about 7 or 8 o'clock I went with my cousins John and Ed Rector and my uncle William Rector from our tent to the shanty. We went to clean the mud out of the shanty in order to move back into it. The water then had gone down and left the shanty. John Rector carried a small garden hoe on his shoulder to be used in scraping the mud out of the shanty. When we neared the shanty we saw Cargile standing by a log pen close to the shanty. I was in front and he spoke to me saying: 'Good morning, Willis.' I said good morning to answer him. He said, 'This looks bilious down here.' I said 'Yes.' He then began to talk about some posts he had lost by the overflow and asked me if I had seen anything of them. I told him no, that there were none of his posts about there. He then called me a damned liar and drew back to hit me. He was in reach of me, and in order to prevent him from striking me I hit him with my fist on the left side of the neck under and in front of the ear. Cargile then drew his knife and rushed at me with it open saying: 'You damned lying son of a bitch, I will cut your guts out.' Old man Rector and Ed Rector had passed by us before the difficulty had commenced and gone into the shanty. John Rector had also passed us and stopped close to and in front of the shanty door. John was standing in front of the shanty door when Cargile drew the knife and run at

me. I backed quickly to the shanty door where John was standing holding the hoe. I asked him to give it to me, and as he didn't hand it to me I grabbed it out of his hands and struck Cargile with it twice, once on the side and arm and once on the back. Cargile then turned and ran and as he did so I followed him two or three steps and threw the hoe at him hitting him on the hip. Cargile ran north towards his house. After he had run about forty or fifty steps he turned and said: 'Willis, you've played hell.' I replied: 'I don't know whether I have or not.' The last I saw of Cargile he was still going through the field towards his house, then he fell and lay still. It is about three hundred yards from our shanty to Cargile's house. John Rector took no hand in the difficulty between me and Cargile. He did not strike nor attempt to strike Cargile. He didn't aid or abet me in anyway in the difficulty. I hit Cargile with my fist and with the hoe, as I have stated, in self-defense. If I hadn't struck Cargile with the hoe he would have cut me with his knife. He run at me and was nearly close enough to cut me when I hit him with the hoe. (Here witness is shown the knife identified as being found close to Cargile's body by other witness.) That looks like the knife Cargile had in his hand when he rushed at me. He had the big blade open. I did not see Cargile fall in the field. After watching him for a short time as he went north towards his house I went into our shanty and helped clean it out. I helped for an hour or so and then in company with defendant John Rector took the boat and went to Peter Tucker's. We returned to the shanty about 4 o'clock in the afternoon and remained there until about 9 o'clock the next morning, when we again went to Tucker's. Returning again early in the afternoon we remained around the shanty until the next day at about 4 o'clock in the afternoon when

John and Ed Rector and I started in the boat to Tucker's to get some tobacco. We had just got in the boat and were going over the bayou when we heard two shots fired one right after the other and heard the shot striking all around us. I said to the boys: 'We'd better jump out or we'll get hit.' As soon as I said this, John and I both jumped out leaving Ed Rector sitting in the boat. We ran across the water and made our way toward Peter Tucker's. We were afterwards arrested about a quarter of a mile from and in sight of Mr. Tucker's house. We jumped out of the boat and ran to save our lives. They were shooting at us and we were afraid we would be shot if we stayed in the boat. A third shot was fired after we jumped out. The first I heard was the shooting. I heard no one halloo halt before the shooting commenced."

The testimony of the defendant fully corroborates that of the other witnesses whose testimony has already been quoted. Other evidence tends in the same direction, for instance, the body of Cargile was found by his son in his own field about 8 o'clock in the evening of the day of the homicide, and close to it was his knife with the large blade open and indications of knee and finger prints in the soft mud showing that he had fallen there, and there were tracks of one man leading to where the body had apparently fallen, and the tracks of two men coming and going towards that spot. This was a little over half way towards Cargile's house from that of Rector's, the houses being some three hundred yards apart. There were no wounds on the body of deceased which could have caused death except perhaps a contusion (without any abrasion of the skin) between the cheek and the neck, which probably had been caused, as testified by Dr. McMenomy, a witness for the state, by a sandbag or by the *fist*. This physician thought the neck of deceased was dis-

located close to the skull, and that he did not think Cargile could have reached the point where his body was found, after receiving such an injury; but he admitted it was possible for the dislocation to have been caused by the fall on the ground where the body lay, and that a man might have his neck slightly injured by a blow, and then the dislocation be completed by a fall; and he finally admitted also that he could not tell how or where the dislocation occurred. There was no autopsy of Cargile's body.

Dr. Waters, a witness for defendant, testified that: "There can be a displacement of the vertebrae without compression of the spinal column. A blow upon the neck might cause the rupture of a blood vessel thereby causing an effusion of blood, in which event one could move and travel until the effusion compressed the spiual column. It is possible, but not probable, that the turning of the neck and head of deceased by Dr. McMenomy increased the dislocation. The probability from Dr. McMenomy's testimony is that Cargile died from the rupture of a blood vessel and consequent effusion of blood, which finally compressed the spinal cord causing death. In this event the victim of the violence would be able to travel a considerable distance after receiving the injury. It is possible that a person may receive a partial dislocation of the neck and that afterwards the dislocation may be completed by a fall. Dr. McMenomy did not make a sufficient examination of the neck of deceased to determine whether or not his death was instantaneous on receiving the injury. A person so injured might, after the injury, have traveled a considerable distance."

The testimony of Dr. Morton, another witness for defendant, supports that of Dr. Waters. There was testimony of threats on the part of deceased toward Willis and defendant and of the latter toward deceased.

Vol. 126—22

It also appeared in evidence that these threats had been communicated. It was also shown in evidence that on the morning of the homicide and shortly after its occurrence, Willis and defendant went over to Peter Tucker's and there, it seems, Willis related to Tucker that he had given deceased a *whipping*, and when this statement was repeated by Tucker to his daughter Mollie Allen, in the presence of Willis and defendant, neither of them denied it, and thereupon defendant remarked: "Cargile got enough before he run."

There was also testimony to the effect that, on a prior occasion, some weeks before the homicide, Annie Bechtol, another daughter of Peter Tucker, heard defendant and Willis laughing about running deceased over the water in a flat boat, at which time threats of defendant towards Cargile were made.

There was also testimony that two witnesses who were going in a boat on the bayou on the afternoon of the homicide, saw defendant going north towards where the body of Cargile was afterward found. One of the witnesses says defendant was "*sneaking*" towards that spot. Both agree that he was in about twenty-five yards of where the body was found. They hallooed at him, when he stopped, looked around and changed his course and went back southward in the opposite direction from which he had come, going towards the Rector shanty.

This is the substance of the testimony. Anything material heretofore omitted in it will be adverted to further on.

*Noell & Killian* for appellant.

(1) The indictment in this case is insufficient to support a conviction for murder. None of the essential elements of murder are charged in the conclusion. It

is not charged that defendant killed and murdered deceased, either wilfully, feloniously, premeditatedly, deliberately or of malice aforethouhght. *State v. Meyers*, 99 Mo. 107; Kelley's Criminal Law [2 Ed.], sec. 503; *State v. Stacy*, 103 Mo. 11. (2) Nor is the failure to allege these constituent elements of murder helped by the words "in manner and form aforesaid," contained in the conclusion. *State v. Morgan*, 112 Mo. 202; *Gaerson v. Com.*, 99 Pa. St. 388. (3) If the indictment had charged that defendant killed and murdered deceased "feloniously," it would have been good for manslaughter, but the omission to so charge renders the indictment invalid even for that offense. Kelley's Criminal Law [2 Ed.], sec. 503; *State v. Herrell*, 97 Mo. 105; *State v. Doyle*, 107 Mo. 36; *State v. Pemberton*, 30 Mo. 376; *State v. Clayton*, 100 Mo. 518. (4) The indictment does not allege the weapon or means of death. After charging the assault it continues thus: "And that the said Henry Willis some heavy weapon or instrument" * * * "did forcibly strike and beat the said Charles Cargile." It will be perceived that the indictment does not charge the striking and beating to have been done "with" some heavy weapon or instrument. In an indictment for murder the manner in which the murder was committed is material and must be set forth with accuracy. *State v. Jones*, 20 Mo. 58; Kelley's Criminal Law [2 Ed.], sec. 484. (5) The word "with" can not be supplied by intendment, nor is its omission cured by the statute of jeofails. While in misdemeanor cases clerical errors will be disregarded or supplied by intendment, yet in felony cases the rule is different. In the latter cases clerical errors which reach the substance of indictments are fatal unless they are covered by the statute of jeofails. *State v. Edwards*, 19 Mo. 674; *State v. Herrell*, 97 Mo. 105; *State v. Blan*, 69 Mo. 317; Revised Statutes,

section 4115.   (6) The indictment is insufficient in that it fails to charge that the homicidal act itself, that is, the giving of the mortal wound, was done "feloniously" etc.   The failure thus to charge is not supplied by the allegation that the assault was made "feloniously," etc. *State v. Herrell*, 97 Mo. 105; *State v. Feaster*, 25 Mo. 324; 1 Bishop's Criminal Procedure, sec. 564.

*R. F. Walker*, Attorney General, for the state.

(1) The indictment in one count charged the defendants with murder in the first degree.   It is in the form many times approved by this court, and is not subject to the objections and criticism of defendant's counsel.   *State v. Stacy*, 103 Mo. 11.   (2) The evidence is sufficient to support the verdict.   It clearly appears that defendant was at the place of the homicide at the time of the killing.   That he had previously made threats against the life of the deceased.   That he had attempted to escape to avoid arrest and prosecution.   All these, with the other facts necessary to establish his guilt, were clearly proven.   It was sufficient to authorize the trial court in submitting the question of defendant's guilt or innocence to the jury for their determination, and upon the testimony they have said the defendant was guilty beyond a reasonable doubt.   There are no indications of prejudice or passion contributing to produce the verdict, and this court will not interfere.   *State v. Moxley*, 115 Mo. 644.

SHERWOOD, J.—I. The indictment in this cause is clearly bad, and this for several reasons.   *a.* Because the word *"with"* being omitted therefrom, there is no allegation showing with what the alleged homicidal act was done.   In criminal prosecutions, everything constituting the offense must be set forth with certainty and clearness, nothing must be left to be

The State v. Rector.

implied. This is true of all felonies. Hawkins says: "That in an indictment nothing material shall be taken by intendment or implication." 2 Hawk. P. C. ch. 25, sec. 60. If an essential word be dropped, it is fatal. Wharton on Crim. Plead. and Prac. [9 Ed.], sec. 275, and cases cited.

b.  The [indictment is also faulty in that it has not the proper conclusion. "Did kill and murder" is wholly insufficient. The indictment in its conclusion should have alleged: And so the jurors aforesaid upon their oath aforesaid do say, that the said Henry Willis and John Rector him, the said Charles Cargile, in manner and form aforesaid, and by the means aforesaid, did feloniously, wilfully, deliberately, premeditatedly and of their malice aforethought, kill and murder, etc. *State v. Meyers*, 99 Mo. 107; 2 Bishop on Cr. Proc. [3 Ed.], secs. 541, 548; Wharton on Hom. [2 Ed.], ch. 22, subdiv. 19, p. 673; *Com. v. Gibson*, 2 Va. Cas. *loc cit.* 74; 3 Chit. Cr. Law, 737, 779; Kelley's Cr. Law and Prac. [2 Ed.], sec. 503. Any material omission in the conclusion of an indictment is as fatal as if occurring in any other portion of the instrument. *State v. Pemberton*, 30 Mo. 376.

II. The evidence in this cause is entirely lacking in every constituent element necessary to establish the guilt of defendant; this is apparent for several reasons: The evidence shows beyond peradventure that defendant did not by word or act, aid, abet or assist Willis in striking Cargile, either with fist or hoe. This appears in the clearest possible manner by the testimony of Ed. Rector, and by that of Willis, who entirely exonerates defendant from any participation in the acts resulting in Cargile's death. Though the probative force of defendant was affected by the record of his conviction for larceny, yet, still, that record did not destroy his

competency as a witness, and he testifies to substantially the same facts as Willis and Ed. Rector. There is no testimony to the contrary. In fact, the evidence tends to corroborate the statements made by the three witnesses just mentioned. Cargile is found dead with his knife open lying by his side, the soft mud indicating that he had walked and fallen there; the contusion between his cheek and his neck, as shown by the testimony of one of the physicians, might have resulted from a blow of the fist; and the testimony of other physicians shows that if the death did result from a blow of the fist, it was in consequence of a rupture of a blood vessel, which produced a fatal pressure on the spinal cord, and that, in such circumstances, a person suffering from such an injury, might be able to walk as far as Cargile is said to have walked before he fell. Besides, as no autopsy was held, it is impossible to tell what really did cause Cargile's death, and so one of the physicians testified. He may have died as the result of heart disease, or of one of the "thousand natural shocks that flesh is heir to."

It is true that defendant did not, after discovering that Cargile still lay where he fell, obey the dictates of humanity, by going to his assistance or by informing the neighborhood of the sad affair; but defendant was not tried on the *humanity* counts; and there is no evidence to be found in the record that defendent attempted to escape. The endeavor to escape being *shot* by jumping into the water is a widely different thing. If the evidence did show an attempt to escape, that fact, standing alone, would not be sufficient. "In *criminal* trials the party accused is entitled to the benefit of the legal presumption in favor of innocence, which in doubtful cases is always sufficient to turn the scale in his favor. It is, therefore, a rule of criminal law, that *the guilt of the accused must be fully proved.*

Neither a mere preponderance of evidence, nor any weight of preponderant evidence, is sufficient for the purpose, unless it generate full belief of the fact, to the exclusion of all reasonable doubt.   *   *   *   And this degree of conviction ought to be produced when the facts proved coincide with, and are legally sufficient to establish the truth of, the hypothesis assumed, namely, the guilt of the party accused, and are inconsistent with any other hypothesis.  For it is not enough that the evidence goes to show his guilt; it must be inconsistent with the reasonal supposition of his innocence." 3 Greenleaf on Evidence [14 Ed.], sec. 29.

Suspicions however strong or probabilities however great will not answer.  Even a *prima facie* case will not warrant a conviction.  *Ogletree v. State*, 28 Ala. 693 and cases cited.

III.   Whatever may have been the guilt of Willis, there is nothing in the evidence to implicate the defendant.  But if Willis, in doing what he did do, was only engaged, so far as the evidence shows, in his lawful self-defense, then clearly no culpability could attach either to him or to defendant, although the latter encouraged or aided him in doing an act lawful in itself.   2 Bishop's New Criminal Law, sec. 1259; 1 *Ib*. sec. 877; 1 East's P. C. 289.   The trial court gave an instruction embodying the view just presented, and this, under the authorities, was correct.

As there is no evidence which supports the verdict, the judgment will be reversed and the defendant discharged.

As to clause *a* of the first paragraph, no opinion is expressed by my associates.   Judge GANTT is in favor of reversing and remanding.  BURGESS, J., concurs.