******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JASON GONZALEZ
(SC 18991)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued January 10—officially released April 15, 2014*

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, and *Richard J. Colangelo, Jr.*, senior assistant state's attorney, for the appellant (state).

*Glenn W. Falk*, assigned counsel, for the appellee (defendant).

*Opinion*

ROBINSON, J. The sole issue in this certified appeal is whether there is sufficient evidence to support the jury's verdict that the defendant, Jason Gonzalez, committed manslaughter in the first degree with a firearm as an accessory in violation of General Statutes §§ 53a-8 (a)[1] and 53a-55a (a),[2] in connection with a shooting that occurred during an altercation in Norwalk's Roodner Court housing complex (Roodner Court) on Christmas night in 2007. The state appeals, upon our grant of its petition for certification,[3] from the judgment of the Appellate Court reversing in part the trial court's judgment of conviction and remanding the case to that court with direction to render judgment of acquittal on the charge of manslaughter in the first degree with a firearm as an accessory, the charge that enhanced the defendant's sentence in accordance with General Statutes § 53-202k.[4] *State* v. *Gonzalez*, 135 Conn. App. 101, 102–103, 41 A.3d 340 (2012). On appeal, the state contends that the Appellate Court improperly concluded that there was insufficient evidence to prove beyond a reasonable doubt that the defendant had acted as an accessory by intentionally aiding Donald Wilson, the person who fired the fatal shots. Guided by, inter alia, our recent decision in *State* v. *Bennett*, 307 Conn. 758, 59 A.3d 221 (2013), we conclude that the record contains insufficient evidence to prove that the defendant intentionally aided Wilson in committing the homicide. Accordingly, we affirm the judgment of the Appellate Court.

The record reveals the following relevant facts, which the jury reasonably could have found, and procedural history. On the night of December 25, 2007, Kenny Jackson was in a third floor apartment in Roodner Court's building thirteen, celebrating Christmas by having drinks with friends. Shortly before 11 p.m., Jackson left the apartment and went downstairs to the first floor of the building in an attempt to purchase marijuana and crack cocaine. In the first floor hallway, Jackson encountered several people, including the defendant and Wilson. Jackson asked them, "who's straight," which is street slang for "[w]ho's got drugs," to which Wilson replied that "he [had] something." Jackson then went with Wilson to a balcony in the second floor hallway to consummate the drug sale.

While Jackson and Wilson were in the second floor hallway, the victim, Larry Paulk, a longtime acquaintance of Jackson, exited his mother's apartment, where his family had gathered for a Christmas celebration, and "star[ed]" at the men, leading Jackson to sense that the victim was bothered by the drug sale occurring there. Jackson and Wilson then left the second floor and went to the back door on the first floor of the building to complete the sale out of the victim's view. Shortly thereafter, the victim came downstairs and

around the corner toward that back doorway; Jackson asked Wilson to "[w]ait until he leaves" before making the sale. The victim then walked down the hallway toward the building's front door. Jackson and Wilson then moved in that same direction, at which point the defendant was waiting by the front door. As the victim left the building, the defendant said "Merry Christmas." The victim, however, ignored him, leading the defendant to call the victim an "asshole." The victim then turned, reentered the building, and confronted the defendant in the vestibule area, where two young women also were present.

Although Jackson attempted to defuse the brewing confrontation by saying, "Larry, he didn't say anything to you," the defendant drew a Glock semiautomatic handgun and pointed it at the victim, stating, "Yeah, I didn't say anything. I didn't say anything to you." While the two men were standing face-to-face, the victim then grabbed at the handgun in the defendant's hand, and they began to wrestle, prompting Jackson to flee from the building to the nearby streets. Shortly thereafter, while in flight, Jackson heard a gunshot; he did not see who fired the gun. Jackson then flagged down James Wright, a Norwalk police officer, for assistance.

In the meantime, Fred Paulk (Fred), the victim's brother, who was also attending his family's Christmas celebration, heard two gunshots approximately three minutes after the victim left the second floor apartment. Fred then ran to the balcony and saw the victim wrestling with the defendant on the ground in the first floor hallway, while one of the young women held the defendant around the waist, telling him to stop fighting. Fred then saw Wilson standing in the front doorway pointing the defendant's gun, which had fallen to the floor during the struggle, at the victim.[5] When the victim broke loose from the struggle, he fell back against the wall with mailboxes for the building, and the defendant and the woman fell toward the door. Despite Fred's pleas, Wilson fired two shots at the victim at close range; one, the fatal shot, struck him in the chest, and the other struck him in the elbow and upper arm before the bullet lodged in the victim's chest wall. Wilson then grabbed the defendant by his shirt, and dragged him out of the building moving backward like he "was using him as a shield," with one hand, while pointing the gun with the other. Fred yelled at Wilson as he and the defendant ran away, threatening to kill him. The police arrived at the scene shortly thereafter.[6]

The defendant and Wilson were subsequently arrested.[7] The state charged the defendant in a four count amended information with manslaughter in the first degree with a firearm as an accessory in violation of §§ 53a-8 (a) and 53a-55a (a), criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1),[8] carrying a pistol without a permit in violation of

General Statutes § 29-35 (a), and sought the sentence enhancement pursuant to § 53-202k for having committed a class A, B or C felony with a firearm. The case was tried to a jury. Following the trial court's denial of the defendant's motions for acquittal,[9] the jury returned a verdict finding the defendant guilty on all counts. The trial court rendered a judgment of guilty in accordance with the jury's verdict, and sentenced the defendant to a total effective sentence of forty-five years imprisonment, of which ten years was a mandatory minimum.[10]

The defendant appealed from the manslaughter conviction and the associated sentence enhancement[11] to the Appellate Court, claiming, inter alia,[12] that there was insufficient evidence that he had "solicited, requested, commanded, importuned or intentionally aided" Wilson in the commission of the homicide. *State* v. *Gonzalez*, supra, 135 Conn. App. 103. In a unanimous opinion, the Appellate Court agreed with the defendant, and rejected the state's argument that "the defendant was properly convicted upon sufficient evidence, both direct and circumstantial, and from the 'intricate chain of eminently reasonable and logical inferences flowing from the evidence.' " Id., 108–109. The Appellate Court determined that the "record is devoid of any evidence that the defendant solicited, requested, commanded, importuned or intentionally aided Wilson in the commission of the crime of manslaughter. Moreover, there were no facts before the jury from which it reasonably could have inferred that the defendant engaged in such conduct. The testimony adduced at trial indicated that the defendant pointed a gun at the victim, and the two then began struggling for the weapon. The record contains no evidence, however, as to how the gun came into Wilson's possession, nor any evidence of any conduct by the defendant which reasonably could be interpreted as assisting Wilson."[13] Id., 109. The court further noted that, "[a]lthough the defendant brandished a gun at the victim, the evidence suggests that this event occurred independently of the drug transaction. There was no evidence that the defendant participated at all in the drug transaction."[14] Id., 110. Thus, the Appellate Court concluded that "the jury could not have inferred reasonably and logically that there was sufficient evidence to convict the defendant of manslaughter in the first degree with a firearm as an accessory." Id., 113. Accordingly, the Appellate Court reversed the trial court's judgment "with respect to the defendant's conviction of manslaughter in the first degree with a firearm as an accessory and with respect to the sentence enhancement pursuant to § 53-202k," and remanded the case to that court "with direction to render judgment of acquittal on that charge and to resentence the defendant on the remaining charges  . . . ." Id. The Appellate Court affirmed the trial court's judgment "in all other respects." Id. This certified appeal followed. See footnote 3 of this opinion.

On appeal to this court, the state claims that, under the well established standard of review applicable to sufficiency of the evidence claims, the jury's verdict is supported by a "chain of reasonable and logical inferences from the evidence that established the defendant's guilt beyond a reasonable doubt." The state posits that, from the evidence adduced at trial, the jury reasonably could have inferred that the defendant acted to aid Wilson because: (1) given the correlation between guns and the narcotics trade, Wilson and the defendant "were operating together to sell drugs inside . . . Roodner Court," and the "defendant was armed with a firearm in order to protect Wilson and their drug enterprise"; and (2) citing *State* v. *Turner*, 252 Conn. 714, 751 A.2d 372 (2000), the defendant was the party who had "aided Wilson in shooting the victim by [providing the weapon and] introducing it into the situation," including by pointing the gun at the victim. The state argues that, "[p]ut another way, this incident was really about a concerned citizen interrupting a drug deal, and his being shot by the second dealer or accomplice after the first one—the defendant—initially drew a gun on the citizen." The state further contends that the Appellate Court's conclusion to the contrary resulted from an improper application of the standard of review that allowed it to "suggest that it was equally reasonable for the jury to draw inferences from the evidence that were consistent with a finding of innocence," namely, that: (1) "the defendant was merely present in the hallway with Wilson and not associated with the drug trade"; and (2) "Wilson acquired the gun in the midst of the struggle between the victim and the defendant and not because the defendant gave the weapon to him."

In response, the defendant contends that there was no evidence that he solicited, requested, importuned or intentionally aided Wilson by giving him the gun, as the state's theory of the case was that Wilson picked up the gun after it was dropped during the struggle between the victim and the defendant. See footnote 5 of this opinion. Noting the conceptual difference between accessorial liability under § 53a-8, and conspiratorial liability under the *Pinkerton* doctrine,[15] the defendant relies on our recent decision in *State* v. *Bennett*, supra, 307 Conn. 758, and emphasizes that the state did not plead or prove that Wilson and the defendant had engaged in a conspiracy to sell drugs in Roodner Court, with the victim's shooting being a foreseeable result of that conspiracy. Particularly given the lack of evidence of any "coordination or preconcert" between Wilson and the defendant, the defendant posits that the sole reason he drew the gun on the victim was their "petty verbal dispute, not to protect anyone's drug business." Further, the defendant argues that his "conduct after the shooting yields no facts or inferences revealing any intent to aid the principal as part of an ongoing criminal

enterprise," again contrasting *Bennett* and noting that Wilson had dragged him out of the building, using him as a human shield. Finally, the defendant cites numerous sister state decisions from Kentucky, Missouri, and Virginia[16] as illustrative of the propositions that, under an accessorial theory of liability, absent evidence of "prearrangement, mutual understanding, or concerted action, a defendant cannot be held liable as an accessory unless he encourages the principal by some overt act or oral expression to commit the crime charged," and that "the accused cannot be convicted of the independent crime of a confederate not committed in the execution of a common design, even if the defendant is involved in some other criminal activity." We agree with the defendant, and conclude that the Appellate Court properly determined that there was insufficient evidence to support his conviction for manslaughter in the first degree with a firearm as an accessory.[17]

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, [w]here a group of facts are relied upon for proof of an element of the crime it is their cumulative impact that is to be weighed in deciding whether the standard of proof beyond a reasonable doubt has been met and each individual fact need not be proved in accordance with that standard. It is only where a single fact is essential to proof of an element, however, such as identification by means of fingerprint evidence, that such evidence must support the inference of that fact beyond a reasonable doubt. . . .

"As we have often noted, however, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there

is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty. . . . Furthermore, [i]t is immaterial to the probative force of the evidence that it consists, in whole or in part, of circumstantial rather than direct evidence." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 65–66, 43 A.3d 629 (2012).

In order to convict the defendant of manslaughter in the first degree with a firearm as an accessory in violation of §§ 53a-8 (a) and 53a-55a (a), "the state must prove that the defendant, acting with the intent to cause serious physical injury to another person, intentionally aided a principal offender in causing the death of such person or of a third person, and that the principal, in committing the act, used, carried or threatened to use a firearm." *State* v. *Gonzalez*, 300 Conn. 490, 496, 15 A.3d 1049 (2011). The state must prove "a dual intent . . . namely, that the defendant intended to inflict serious physical injury and that he intended to aid the principal in doing so. . . . When a defendant is charged with a violation of § 53a-55a as an accessory, the state need not prove that the defendant intended the use, carrying or threatened use of the firearm. . . . Proof of the intent element is satisfied if the principal in fact used the firearm." (Citations omitted; internal quotation marks omitted.) Id., 510.

Further, consistent with well established "underlying principles of accessorial liability," the state must prove that the defendant acted as an accessory by soliciting, requesting, commanding, importuning or intentionally aiding Wilson in causing the victim's death. *State* v. *Foster*, 202 Conn. 520, 531, 522 A.2d 277 (1987); see also *State* v. *Gonzalez*, supra, 300 Conn. 496. This is because accessorial "liability is designed to punish one who intentionally aids another in the commission of a crime and not one whose innocent acts in fact aid one who commits an offense. . . . Mere presence as an inactive companion, passive acquiescence, or the doing of innocent acts which may in fact aid the one who commits the crime must be distinguished from the criminal intent and community of unlawful purpose shared by one who knowingly and wilfully assists the perpetrator of the offense in the acts which prepare for, facilitate or consummate it." (Citation omitted; internal quotation marks omitted.) *State* v. *Foster*, supra, 531.

Having reviewed the record in the present case, we agree with the defendant, and conclude that the Appellate Court properly determined that the evidence did not establish beyond a reasonable doubt that he acted as Wilson's accessory. First, as the state conceded at oral argument before this court, there is no evidence of words or other conduct that amounted to the defendant commanding, directing, soliciting, requesting, or

importuning Wilson to shoot the victim—including during their struggle.[18] Second, and consistent with the state's theory at trial that the gun had dropped to the ground during the scuffle between the defendant and the victim; see footnote 5 of this opinion; the record simply lacks evidence to support inferences that the defendant had intentionally aided Wilson by in some way deliberately putting the gun in his hand during that struggle, or otherwise assisting him in the commission of the shooting or the flight therefrom. To the contrary, the evidence suggests that the defendant's presence had the effect of impeding Wilson's flight, insofar as Wilson dragged the defendant out and used him as a human shield in the process. Thus, although the defendant was by no means an innocent bystander in the chain of events that lead to the victim's death, the evidence is nevertheless insufficient to prove his guilt beyond a reasonable doubt under an accessory theory of criminal liability.

The state, however, reiterates its trial theory; see footnote 5 of this opinion; that the jury reasonably could have inferred that the defendant acted intentionally to aid Wilson given the correlation between drug dealing and guns, the fact that the defendant introduced the gun into the situation, and that it was apparent that they were "operating together to sell drugs" at Roodner Court. We disagree. In our view, the state's broadly conceived "cahoots" argument is a belated attempt to substitute conspiratorial liability under the *Pinkerton* doctrine for the proof necessary to establish guilt as an accessory. We recently explained the critical differences between these concepts in *State* v. *Bennett*, supra, 307 Conn. 764, noting that, because "the present case involves sufficiency of proof to assign criminal responsibility to the defendant for a fatal injury inflicted by another, it is useful to be mindful of the substantive differences between the three theories under which such vicarious liability may arise: felony murder under [General Statutes] § 53a-54c; *Pinkerton* liability; and accessorial liability under § 53a-8." (Footnote omitted.) After explaining felony murder liability under § 53a-54c,[19] we noted that, under "the *Pinkerton* doctrine . . . a defendant may not be convicted of murder unless one of his criminal associates, acting foreseeably and in furtherance of the conspiracy, caused the victim's death with the intent to do so. . . . Thus . . . under *Pinkerton*, a coconspirator's intent to kill may be imputed to a defendant who does not share that intent . . . . The rationale for liability under this theory is that [w]hen the defendant has played a necessary part in setting in motion a discrete course of criminal conduct . . . he cannot reasonably complain that it is unfair to hold him vicariously liable . . . for the natural and probable results of that conduct that, although he did not intend, he should have foreseen. . . .

"[T]o be guilty as an accessory one must share the

criminal intent and community of unlawful purpose with the perpetrator of the crime and one must knowingly and wilfully assist the perpetrator in the acts which prepare for, facilitate or consummate it. . . . Thus, [u]nlike coconspirator liability under *Pinkerton* . . . accessorial liability pursuant to § 53a-8 requires the defendant to have the specific mental state required for the commission of the substantive crime. . . . [A]ccessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed . . . . Consequently, to establish a person's culpability as an accessory to a particular offense, the state must prove that the accessory, like the principal, had committed each and every element of the offense. . . . Each such element must be proved beyond a reasonable doubt." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) Id., 764–65.

Observing the differences between these theories, we concluded in *Bennett* that, with respect to accessory liability, there was insufficient evidence that the defendant in that case intended to kill the occupant of an apartment during a home invasion to steal drugs and/ or cash when there was no evidence that the defendant knew the victim or what the defendant had said or done during a brief conversation prior to the principal shooting the victim; the defendant also had carried a loaded gun to the scene, and thereafter continued the robbery by threatening the victim's girlfriend at gunpoint while demanding to know where the victim kept money and drugs.[20] See id., 766–68. In so concluding, we observed that "the evidence in the present case would have made a strong case for murder under a theory of *Pinkerton* liability, but falls short of the requisite proof for accessorial liability. Therefore, because the state did not advance a theory of liability under the *Pinkerton* doctrine, and the state did not prove beyond a reasonable doubt that the defendant intended to cause [the victim's] death, the defendant's conviction for murder as an accessory cannot stand." Id., 774; see also id., 770 ("[a]lthough it is reasonable to infer from the defendant's entry into [the] bedroom [of the victim's girlfriend] with a loaded gun immediately following the shooting, simultaneously with [the principal], that the defendant was in close proximity when [the principal] shot [the victim] and that he was in possession of a loaded gun at that time, it would be sheer speculation to conclude that the defendant threatened [the victim] with the gun or engaged in any act preceding the shooting that aided, encouraged or facilitated the shooting" [emphasis omitted]).

In the present case, as in *Bennett*, the state did not undertake to plead and prove the existence of a conspiracy between the defendant and Wilson—including one related to the sale of drugs in Roodner Court—much less that the victim's death was the natural and probable

result of any such conduct. Thus, although the state relies on the concept of "cahoots" to sustain the defendant's conviction arising from his role in the victim's death, absent proper pleading and proof of conspiracy in accordance with the *Pinkerton* doctrine, such allegations or evidence nevertheless do not excuse the state from having to prove that the defendant intentionally aided Wilson with respect to the specific act that caused the victim's death. See *State* v. *Gonzalez*, supra, 300 Conn. 510 n.21 ("[t]he state still must prove that the defendant committed or helped to commit all elements of the underlying substantive crime for liability to attach under § 53a-8; in contrast, under the *Pinkerton* doctrine, the state is relieved of that burden, but instead must prove the existence and scope of a criminal conspiracy in order for liability to attach"); see also *State* v. *Bennett*, supra, 307 Conn. 771 ("although a foreseeable risk of death to a victim in the course of a crime is a basis on which felony murder and *Pinkerton* liability may be established, foreseeability is not commensurate with the conscious objective to cause death required for accessorial liability").

Moreover, the state's failure to plead and prove the defendant's liability under the *Pinkerton* doctrine undermines its reliance on this court's decisions in *State* v. *Cooper*, 227 Conn. 417, 426 n.5, 630 A.2d 1043 (1993), and *State* v. *Delossantos*, 211 Conn. 258, 281, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989), which note the well established correlation between drug dealing and firearms, to support the reasonableness of the inferences drawn by the jury. First, the state's reliance on these cases is misplaced because neither utilizes the correlation between drug dealing and firearms by itself to establish an element of a crime. See *State* v. *Cooper*, supra, 425–26 and 426 n.5 (trial court properly admitted prior misconduct evidence of drug dealing by defendant in order to prove that victim was shot because he had interfered with defendant's narcotics sale, given "the predilection of those selling drugs outside familiar territory to carry weapons to protect themselves and their merchandise");[21] *State* v. *Delossantos*, supra, 280–81 (presence of loaded handgun owned by defendant, without permit, in car that he was driving relevant to prove his knowing possession of narcotics present in that car). Second, and consistent with *Bennett*, the defendant's possession of the loaded gun in proximity to Wilson and his drugs, in addition to his possible role as a lookout during Wilson's attempt to consummate the drug transaction with Jackson, could well have been probative circumstantial evidence of the existence of a conspiracy between them to sell drugs at Roodner Court, of which the death of an interfering party could be a foreseeable, natural, and probable consequence. Because the state did *not*, however, prosecute the defendant under a *Pinkerton* theory of criminal liability, the defendant's pos-

session of a gun in conjunction with Wilson's narcotics activities does not, by itself, support an inference of intentional assistance in Wilson's commission of the homicide in the present case. Cf. *State* v. *Abreu*, 106 Conn. App. 278, 286, 941 A.2d 974 (concluding that "well established correlation between drug dealing and firearms" is "insufficient to substantiate a belief that [a drug dealer] is armed or dangerous at the time he is killed," and noting lack of evidence that "the victim was armed when the defendant shot him or even that the defendant had ever seen or known the victim to be in possession of a firearm"), cert. denied, 286 Conn. 919, 946 A.2d 1249 (2008).

Finally, like the Appellate Court, we also disagree with the state's reliance on, inter alia, *State* v. *Turner*, supra, 252 Conn. 714, in support of its contention that sufficient evidence of the defendant's conduct as an accessory existed because the jury "had before it circumstantial evidence . . . from which it could infer that all three shots were fired from one handgun and that only one handgun was used to shoot the victim, i.e., the handgun that the victim introduced into the dispute." See *State* v. *Gonzalez*, supra, 135 Conn. App. 111–12. *Turner* is distinguishable because the defendant in that case apparently provided the murder weapon to the principal in an exchange that occurred well in advance of the shooting therein. See *State* v. *Turner*, supra, 749–50. In comparison, the record in the present case contains no evidence that the defendant did anything before or during the fracas that occurred prior to the shooting to give the gun to Wilson. Moreover, *Turner* featured far more evidence of acts by the defendant therein that constituted the actions of an accessory, including driving the getaway car and " 'dancing around' " across the street from where the victim and his friends stood in order to distract them from the approaching shooter. See id., 749; see also *State* v. *Foster*, supra, 202 Conn. 535–36 (sufficient evidence that defendant was accessory to criminally negligent homicide when he gave knife to principal, who had accompanied him in locating victim, with direction to use it to keep victim from escaping); *State* v. *Harris*, 49 Conn. App. 121, 132, 714 A.2d 12 (1998) (sufficient evidence that defendant was accessory to manslaughter in first degree when he commanded gang members to shoot competing drug dealer in buttocks to scare him, supplied gun, helped locate victim, and helped shooter flee and destroy evidence). The evidentiary vacuum that exists in the present case with respect to the defendant's role in placing the gun in Wilson's hands or otherwise assisting him in the commission of the homicide stands in sharp contrast, then, to the factual records before this court and the Appellate Court in *Turner*, *Foster*, and *Harris*.[22] Accordingly, we conclude that the Appellate Court properly determined that the defendant's conviction for manslaughter in the first degree with a firearm

as an accessory was not supported by evidence sufficient to prove his guilt beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] General Statutes § 53a-55a (a) provides: "A person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses, or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, machine gun, rifle or other firearm. No person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

General Statutes § 53a-55, in turn, provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person  . . . ."

[3] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly determine that the evidence was insufficient to support the jury's verdict that the defendant was guilty, as an accessory, of manslaughter in the first degree with a firearm?" *State* v. *Gonzalez*, 305 Conn. 915, 916, 46 A.3d 171 (2012).

[4] General Statutes § 53-202k provides: "Any person who commits any class A, B or C felony and in the commission of such felony uses, or is armed with and threatens the use of, or displays, or represents by his words or conduct that he possesses any firearm, as defined in section 53a-3, except an assault weapon, as defined in section 53-202a, shall be imprisoned for a term of five years, which shall not be suspended or reduced and shall be in addition and consecutive to any term of imprisonment imposed for conviction of such felony."

[5] Three cartridge casings and one bullet were recovered from the scene. Gerard Petillo, a forensic science examiner with the firearm and tool mark section of the state forensics laboratory, testified he had examined bullets and cartridge casings recovered from the scene and later from the victim's body, and determined that: (1) all of the casings were fired by the same gun, which was a semiautomatic firearm manufactured by Glock; and (2) the bullets had been fired by a .40 caliber Glock, but it could not be determined whether they had come from the same gun.

We note that the state's theory of the case, as demonstrated by its closing arguments, was that the defendant's intent to cause the victim serious physical injury was proven by: (1) the altercation between the defendant and the victim; and (2) the fact that the defendant pointed a loaded gun at the victim. With respect to proving that the defendant intentionally aided Wilson in killing the victim, the state relied on inferences from the facts that: (1) Petillo's testimony demonstrated that a single gun had been used, which had been introduced into the altercation by the defendant; and (2) Wilson and the defendant were working together to sell drugs that night. Further, the state posited that the gun discharged during the struggle between the victim and the defendant, with one bullet making a second loud noise when it struck the metal apartment door. The gun was then dropped on the ground during the altercation, at which point Wilson picked it up and fired two shots at the victim from close range.

[6] Vidal Gonez, a Norwalk police officer, responded to a radio dispatch, transmitted at 11:13 p.m., reporting shots fired at Roodner Court. Upon his arrival, he saw one officer securing the doorway to building thirteen, and another performing CPR on the victim.

[7] Wilson was ultimately convicted of murder in violation of General Statutes § 53a-54a for his role in causing the victim's death. See *State* v. *Wilson*, 308 Conn. 412, 417, 64 A.3d 91 (2013).

[8] Although § 53a-217 has been the subject of recent amendments; see, e.g., Public Acts 2013, No. 13-3, § 44; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[9] After the close of the state's case-in-chief, the defendant moved for a judgment of acquittal on the first and fourth counts of the information, namely manslaughter in the first degree and the associated felony enhancement. The trial court denied the motion for acquittal, agreeing with the state that there was sufficient evidence to send the case to the jury because: (1) the necessary intent, namely to cause serious physical injury, could be found in the defendant's action of pointing the firearm at the victim; and (2) with respect to whether the defendant had acted as Wilson's accessory, "[i]t's clear that [the defendant and] Wilson were together engaged in some illicit activity in the building there."

The defendant renewed this motion after presenting his own case, relying on his introduction into evidence of prior inconsistent statements by Jackson, which the defendant argued rendered Jackson's testimony incredible. The trial court denied the defendant's second motion as well.

[10] A specific breakdown of the defendant's total effective sentence is set forth in the Appellate Court opinion. See *State* v. *Gonzalez*, supra, 135 Conn. App. 105–106.

[11] The defendant did not challenge his firearms convictions arising from his violations of §§ 29-35 (a) and 53a-217. See *State* v. *Gonzalez*, supra, 135 Conn. App. 102 n.1.

[12] The defendant also claimed that: (1) prosecutorial impropriety during closing arguments deprived him of a fair trial; and (2) there was insufficient evidence that he intended to cause serious physical injury to the victim. The Appellate Court did not reach these claims because of its conclusion that there was insufficient evidence that he had acted as an accessory. See *State* v. *Gonzalez*, supra, 135 Conn. App. 103 nn.4 and 5.

[13] The Appellate Court further concluded that "the evidence does not support a reasonable inference that the defendant aided Wilson merely by introducing the weapon into the situation." *State* v. *Gonzalez*, supra, 135 Conn. App. 111. The court disagreed with the state's reliance on *State* v. *Turner*, 252 Conn. 714, 751 A.2d 372 (2000), deeming *Turner* "inapposite" based on its facts, and noting that, although the "defendant pointed a gun at the victim and then struggled for control of the weapon, this conduct alone does not support a reasonable inference that he, by so acting, intentionally aided the principal in killing the victim." *State* v. *Gonzalez*, supra, 111; see also id., 112 ("There is no evidence, however, that would support a reasonable inference that the defendant gave the weapon to Wilson. Unlike in *Turner*, where the defendant gave the principal the weapon in advance of the crime, in [the present] case the most the evidence suggests is that Wilson acquired the weapon in the midst of the struggle between the victim and the defendant.").

[14] The Appellate Court disagreed with the state's argument that: "Wilson and the defendant were associated in the drug trade, that the victim was interfering with a drug transaction and that the defendant aided Wilson in shooting the victim by 'providing the weapon and introducing it into the situation.' " *State* v. *Gonzalez*, supra, 135 Conn. App. 109. The court observed that the "only circumstantial evidence suggesting that the defendant was associated in the drug trade with Wilson was that they were together when Wilson told Jackson that he would sell him drugs and that the defendant possessed a gun and pointed it at the victim," and emphasized that, as a matter of law, the "defendant's presence near Wilson at the time Jackson inquired about purchasing drugs is insufficient to establish his involvement in the transaction." Id., 109–10, citing, *State* v. *Fair*, 118 Conn. App. 357, 362, 983 A.2d 63 (2009).

[15] *Pinkerton* v. *United States*, 328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). We note that "[t]his court first recognized the theory of liability set forth in *Pinkerton* as a matter of our state's law in *State* v. *Walton*, 227 Conn. 32, 40–54, 630 A.2d 990 (1993) . . . ." (Citation omitted.) *State* v. *Bennett*, supra, 307 Conn. 764 n.1.

[16] Specifically, the defendant points us to *Flowers* v. *Commonwealth*, 278 Ky. 518, 128 S.W.2d 961 (App. 1939), *Combs* v. *Commonwealth*, 224 Ky. 653, 6 S.W.2d 1082 (1928), *State* v. *Rector*, 126 Mo. 328, 23 S.W. 1074 (1894), and *Kemp* v. *Commonwealth*, 80 Va. 443 (1885).

[17] We note that the defendant renews, as an alternate ground for affirming the judgment of the Appellate Court; see Practice Book § 84-11 (c); his claim that there was insufficient evidence that he intended to cause serious physical injury to the victim, as is required by § 53a-55a (a). See footnote 12 of this opinion. Like the Appellate Court, we need not reach this claim because of our conclusion that there was insufficient evidence to prove that the defendant acted as an accessory under § 53a-8 (a).

[18] We note that, at oral argument before this court, some of the discussion with respect to whether sufficient evidence existed to prove the intentional act element of § 53a-8, was colored by whether there was sufficient evidence as to the defendant's intent to cause the victim serious physical injury under §§ 53a-55a and 53a-55, which is raised as an alternate ground for affirming the judgment of the Appellate Court. See footnotes 12 and 17 of this opinion. Although our analysis herein is confined to the proof of intentional aiding required by § 53a-8, we acknowledge that there often is substantial evidentiary overlap with respect to the proof of these different elements. See, e.g., *State* v. *Bennett*, supra, 307 Conn. 768–69 (The court noted that that intent to kill could reasonably be inferred in cases wherein "the defendant had engaged in some act to prepare for, aid, encourage, facilitate or consummate the murder . . . . In some cases, the defendant participated in the killing by inflicting, or attempting to inflict, harm on the victim while the principal inflicted the fatal injury, or the evidence was unclear as to whether the defendant actually inflicted the fatal injury. . . . In cases lacking such proof, the defendant otherwise actively participated in the murder through acts beneficial to the principal such as identifying the victim, taking the principal to the victim, distracting the victim, acting as a lookout to prevent interruption to the murder or facilitating the principal's escape. . . . Oftentimes, evidence of a motive to kill had been established." [Citations omitted; footnote omitted.]).

[19] We explained that the "felony murder statute reflects a legislative determination that certain crimes, such as robbery, create a foreseeable risk of death to a victim of, or bystander to, the crime and, accordingly, imposes criminal liability not only on the person who caused the death, but also on any other participant to the underlying felony. . . . [A] defendant may be convicted of felony murder even if neither he nor his confederates had any intent to kill . . . ." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Bennett*, supra, 307 Conn. 764.

[20] We further noted that: "There also is no evidence to support an inference that the defendant aided or encouraged [the principal] with respect to the fatal act or that the defendant threatened [the victim] directly in any manner. Although the defendant threatened [the victim's girlfriend] by placing a gun to her head, which conveyed an implied threat to kill her if she did not cooperate, there is no evidence from which we can infer that he intended to follow through on that threat. The defendant never discharged his gun, even when encountering another witness to the crime, [the victim's mother], while fleeing the scene." (Footnote omitted.) *State* v. *Bennett*, supra, 307 Conn. 773–74.

[21] We further note that the two decisions of the United States Court of Appeals for the Eighth Circuit cited in *State* v. *Cooper*, supra, 227 Conn. 426 n.5, for the proposition that "[t]here is a well established correlation between drug dealing and firearms," similarly do not use that correlation by itself to establish a fact critical to an offense's act element. See *United States* v. *Simon*, 767 F.2d 524, 526–27 (8th Cir. 1985) (admission of narcotics-dealing activities relevant to establish that defendant illegally possessed firearm); *United States* v. *Milham*, 590 F.2d 717, 721 (8th Cir. 1979) (evidence of gun seized from defendant's van relevant to impeach his testimony that he was traveling for legitimate business purposes, not narcotics trafficking).

[22] We note that neither the parties' briefs nor our independent research has revealed a case, from Connecticut or elsewhere, closely on point with the facts adduced in the record in the present case. We observe, however, that the defendant accurately cites several sister state cases compiled in an annotation from American Law Reports; annot., 12 A.L.R. 275, § 7 (1921 and Cum. Supp. 2013); as illustrative of the nature of the proof required to sustain a conviction under an accessory theory of liability. Compare *Combs* v. *Commonwealth*, 224 Ky. 653, 658, 6 S.W.2d 1082 (1928) (insufficient evidence of aiding and abetting when defendant and his principal were fighting with victim and his friends, one of whom dropped pistol, and principal picked up pistol and shot victim), and *State* v. *Rector*, 126 Mo. 328, 341, 23 S.W. 1074 (1894) (insufficient evidence of aiding and abetting when principal grabbed garden hoe from defendant's hands, brought for scraping purposes, and struck victim with it during fight that took place while cleaning shanty), and *Kemp* v. *Commonwealth*, 80 Va. 443, 452–53 (1885) (insufficient evidence of aiding and abetting during street fight when principal struck victim with axe that was on ground, and defendant "had no knowledge that the axe was there, no knowledge of the murderous use of such an instrument by [principal] until after the fatal blow was struck, and in no way aided in or assented to its use"), with *Flowers* v. *Commonwealth*, 278 Ky. 518, 519–20,

128 S.W.2d 961 (App. 1939) (sufficient evidence of aiding and abetting murder when principal took gun from hip pocket of defendant and shot victim following argument, given that jury could have credited evidence that defendant and principal had conversed shortly before argument, defendant had shown principal gun in his pocket, and said to principal " '[m]ake him give 'em up' ").

We also find instructive the nuanced analysis by the United States Court of Appeals for the Ninth Circuit in *United States* v. *Andrews*, 75 F.3d 552 (9th Cir.), cert. denied, 517 U.S. 1239, 116 S. Ct. 1890, 135 L. Ed. 2d 183 (1996), a case located by our independent research with facts more incriminating than the present case, yet concluding that there was insufficient evidence of aiding and abetting. By way of illustration, armed with rifles supplied by their father, the defendant in *Andrews* had gone with his sister, in a vehicle driven by a friend, to the scene of the altercation, intending to " 'get' " a man who had punched the sister in an earlier altercation by " 'trashing his car.' " Id., 554. Once at the altercation, the defendant shot and killed the man as he stepped out of his truck, leading to the defendant's conviction for murder as a principal. Id. The defendant's sister then fired her gun into a parked car that was present at the scene, striking its occupants and leading to the defendant's convictions for an additional count of murder and attempted voluntary manslaughter, both under an accessory theory. Id. The Ninth Circuit concluded that there was insufficient evidence to support the defendant's convictions of aiding and abetting murder and attempted manslaughter, both based on an accessory theory of criminal liability, arising from his sister's act shooting into the occupied parked car. Id., 556. The court observed that, with respect to those counts, the defendant "did not give [his sister] the shotgun, drive her to the scene, encourage her to shoot, or in any other obvious way assist her in shooting the victims in the car"; id., 555; despite the fact that he was armed, accompanied her to the scene of the crime, and was present there, because "any agreement or understanding between [the sister and the defendant] involved only 'getting' [the man who had punched her] and 'trashing' his car." Id., 556.

---